W. WEST ALLEN
Nevada Bar No. 5566
wwa@h2law.com
JONATHAN W. FOUNTAIN
Nevada Bar No. 10351
jwf@h2law.com
HOWARD & HOWARD ATTORNEYS PLLC
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483
Facsimile: (702) 567-1568

SAMUEL CASTOR
Nevada Bar No. 11532
sam@switch.com
ANNE-MARIE BIRK
Nevada Bar No. 12330
abirk@switch.com
SWITCH, LTD.
7135 S. Decatur Blvd.
Las Vegas, Nevada 89118
Telephone: (702) 444-4102

*Attorneys for Plaintiff Switch, Ltd.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SWITCH, LTD., a Nevada limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> SWITCH, INC., a Washington corporation, <br><br> Defendant. | Case No.: 2:18-cv-00738-KJD-CWH <br><br> **FINDINGS OF FACT AND ORDER FOR PERMANENT INJUNCTION** |

This Court having reviewed and considered the Stipulation and proposed Entry of Permanent Injunction submitted by Plaintiff Switch Ltd., ("Plaintiff Switch") and Defendant Switch, Inc. ("SwitchMe.com") by and through their respective counsel of record, and having examined the Exhibits attached herewith and had an opportunity to take judicial notice of, or hear

testimony on the same, and for good cause appearing therefore make the following findings of fact:

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT:

1.      On or about November 1, 2017, SwitchMe.com, a technology start-up company located in Seattle, Washington, began providing a browser and credit card system under the marks SWITCH, , and SWITCHME.COM.  In connection with its services, on or around November 11, 2017, Defendant acquired the Internet domain name <switchme.com> and created the corresponding website.

2.      On or around March 13, 2017, Switch first became aware of SwitchMe.com, in a press release about Defendant (*see* **Exhibit A**).

3.      On or around November 22, 2017, Plaintiff Switch sent SwitchMe.com a letter, requesting dialogue and alerting Defendant Switch of the likelihood of confusion (*see* **Exhibit B**).

4.      On or around December 20, 2017, Plaintiff Switch began experiencing consumer confusion in light of a press release issued by SwitchMe.com regarding appointment of a new board of director for SwitchMe.com (*see* **Exhibits C and D**).

5.      On or around February 28, 2018, the New York Stock Exchange news about Plaintiff Switch's mark and ticker symbol included the news about SwitchMe.com (s*ee* **Exhibit E**).

6.      Switch's raised concerns with Defendant Switch that SwitchMe.com's marks and activities were causing actual confusion with Switch.

7.      Plaintiff Switch designs, constructs, and operates advanced technology ecosystems, with physical and digital technology infrastructure, under the name SWITCH, and is publicly traded on the New York Stock Exchange under the ticker symbol SWCH (*see* **Exhibit F**).

8.      Switch's trademarks are central to its value because potential customers have many options to choose where they can store their data and technology, locally, nationally and globally. Plaintiff Switch competes locally[1], nationally and globally for data center clients, actively competing with hundreds of competitive offerings in the form of a customer's own office building

---

[1] *See* **Exhibit G**, available at www.flexential.com one of several Las Vegas colocation competitors, Flexential.

deployments[2], a customer's proprietary purpose built data center, an array of competing cloud providers, and/or competing telecommunication providers, all of which are trying to compete for client's participating in the commerce of the World Wide Web (*see* **Exhibits H-N** discussing and analyzing the "global data center market" (emphasis added)).

9.      Other Courts, including state and federal courts in Texas have found that data center services are inherently global (*see* **Exhibits O and P**).

10.      Consequently, Switch competes nationally, and globally, with a vast array of technology companies (not just colocation providers) and uses its brand to differentiate itself from its national and global competition (*see* **Exhibits H-N**).

11.      Because Switch's technology services compete with hundreds of other technology competitors on a national and global market, which requires Switch to actively protect and promote its trademarks and brand.

12.      To this end, Plaintiff Switch owns more than one hundred and forty (140) "SWITCH" federal trademark registrations in various classes, including for data centers, cloud computing, power, telecommunications, software, computers, vehicles, entrepreneurial services, etc.

13.      Plaintiff Switch has spent several hundreds of millions of dollars designing, building, operating, and marketing its technology offerings, to compete in the national and global market place.

14.      Plaintiff Switch owns the mark SWITCH and multiple variants thereto, and has continuously been using the trademark SWITCH in connection with its technology and service offering, nationally, as early as August 31, 2003.

15.      Plaintiff Switch owns multiple U.S. federal trademark registrations for its "SWITCH" marks, including but not limited to, SWITCH (U.S. Reg. No. 3,229,168), SWITCH T-SCIF (U.S. Reg. No. 3,547,908), SWITCH WDMD (U.S. Reg. No. 3,540,816), SWITCHNAP

---

[2] See **Exhibit H**, "7 Reasons Colocation Makes Sense" an industry which helps customers weigh the pros and cons of having their own data centers, or using a colocation provider, or using a cloud provider, recognizing that data centers originated in back offices of commercial office space called "server rooms" or "telco closets," and many businesses maintain their own data centers.

(U.S. Reg. No. 3,547,909), SWITCHNAP WORLD (U.S. Reg. No. 3,880,400), SWITCHFORCE (U.S. Reg. No. 3,942,121), SWITCH MICRO-MOD (U.S. Reg. No. 4,062,244), SWITCHSERVE (U.S. Reg. No. 4,058,546), SWITCHMOD (U.S. Reg. No. 3,984,525), SWITCH L.D.C. (U.S. Reg. No. 3,984,524), SWITCHCLOUD I.C.E. (U.S. Reg. No. 4,062,248), SWITCHSTACK (U.S. Reg. No. 4,107,725), SWITCH IC3 (U.S. Reg. No. 4,104,345), SWITCHCUBE (U.S. Reg. No. 4,335,332), SWITCHSCRIBE (U.S. Reg. No. 4,217,085), SWITCHGAUNTLET (U.S. Reg. No. 4,516,916) SWITCHGAUNTLET (U.S. Reg. No. 4,516,916) SWITCHWORKS (U.S. Reg. No. 3,942,079), SWITCHSAFE (U.S. Reg. No. 3,946,128), SWITCHMACROMOD (U.S. Reg. No. 3,984,966), SWITCH CLOUD AI (U.S. Reg. No. 4,050,103)  SWITCHEDUP (U.S. Reg. No. 4,062,245), SWITCHCORE (U.S. Reg. No. 4,062,254), and SWITCHMICRO-MOD (U.S. Reg. No. 4,137,600) (collectively hereinafter referred to as the "Switch Marks").

16.    Based on Plaintiff Switch's federal registrations, and as has been found previously by this Court, the mark SWITCH is famous (s*ee* **Exhibit Q**).

17.    Furthermore, based on Plaintiff Switch's national and global competition, marketing efforts, and extensive use, Plaintiff Switch owns the exclusive right to use the mark SWITCH and variations thereof.

18.    The extensive advertising and promotion by Plaintiff Switch of the Switch Marks throughout the United States and globally, to compete with national and global competitors, have resulted in the SWITCH name and mark becoming distinctive and famous particularly for technology services, including but not limited to telecommunications services, data center, colocation, computer, software, consulting, design, power, and cloud computing services.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

4

# ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      This Decree shall be the final judgment with prejudice of all claims each of the parties has raised against the other in this lawsuit, including all claims and counterclaims.

2.      Plaintiff Switch's request for Permanent Injunction is GRANTED, subject to any transition period agreed to between the parties.  Subject to any transition period agreed to between the parties, SwitchMe, its respective officers, agents, servants, employees, affiliates, and/or all persons acting in concert or participation with it, are permanently enjoined as follows: (a) from using Plaintiff Switch's SWITCH trademark, the Switch Marks, or variations thereof, alone or in combination with any other letters, words, letter strings, phrases or designs, in commerce or in connection with any business or for any other purpose (including, but not limited to, on web sites, social media platforms, news releases, and in domain names); and (b) from registering, owning, leasing, selling or trafficking in any domain name containing Plaintiff Switch's Marks or variations thereof, alone or in combination with any other letters, words, phrases or designs as the SWITCH mark is a famous mark based on Plaintiff Switch's national and global competition with other data centers, world-wide marketing efforts, and extensive use. Furthermore, Plaintiff Switch owns the exclusive right to use the mark SWITCH and the Switch Marks.

3.      The motion to dismiss and counter-claims SwitchMe raised in this lawsuit are DENIED, with prejudice and a permanent injunction is hereby ordered.

Dated this _26_ day of April, 2019.

_____
UNITED STATES DISTRICT JUDGE

Respectfully submitted by:

**HOWARD & HOWARD ATTORNEYS**

By:___*/s/ W. West Allen*_____
W. West Allen, Nevada Bar No. 5566
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
*Attorneys for Plaintiff Switch, Ltd.*

**KAEMPFER CROWELL**

By:___*/s/ Joni A. Jamison*_____
Joni A. Jamison, Nevada Bar No. 11614
Robert McCoy, Nevada Bar No. 9121
1980 Festival Plaza Drive, Suite 650
Las Vegas, Nevada 89135
*Attorneys for Defendant Switch, Inc.*

INDEX OF EXHIBITS

Exhibit A- Switch Credit Card Article

Exhibit B- Cease and Desist Letter

Exhibit C- Switch, Inc. Adds Kevin T. Knight Article

Exhibit D- NYSE Image

Exhibit E- NYSE Newsfeed

Exhibit F- SWCH ticker

Exhibit G- Discover Flexential Colocation in Nevada

Exhibit H- Blog- 7 Reasons Colocation Makes Sense

Exhibit I- Market Watch Global Outlook and Forecast

Exhibit J- Arizton Global Data Center Market

Exhibit K- Market Research Future Data Centre Market

Exhibit L- Strategy Market Report and Global Forecast

Exhibit M- Mordor Intelligence Mega Data Center Market

Exhibit N- Vertiv Colocation Data Center Usage Report

Exhibit O- Cyrus Application for TRO

Exhibit P- Federal Extension Order Extending Temporary Restraining Order

Exhibit Q- Switch Firespotter Order Granting Stipulation for Entry of Permanent Injunction

# EXHIBIT A



INNOVATION PROJECT®   MARCH 15-16, 2017   HARVARD UNIVERSITY*   ARE YOU ON THE LIST?

SIGN UP

PYMNTS.com®
what's next in payments and commerce

**PAYMENT METHODS**

# Switch Raises More Funding For Credit Card Update Platform



By PYMNTS

Posted on March 13, 2017



Switch, the startup that has an online platform to help consumers manage their credit cards, has reportedly raised $400,000 in funding.

According to **a report**, the $400,000 in funding is from angel investors. Since launching in 2014, Switch has raised close to $2 million.

"Today, credit and debit cards are the dominant payment solutions for consumers," Switch CEO Chris Hopen said in a statement, according to the report. "Switch is the first ever consumer payment solution that automates both the challenge of secure account access and the 'card on file' problems users face every day."

With Switch, customers can get updated information for their credit cards, which provides them with a quick and efficient way to make sure their payments are up-to-date and better visibility into their account information. The idea is also to enable people to update their payment information if the credit card is lost, stolen or no longer in use by the consumer. As it stands, the user would have to go to each website to change their payment information. It's getting worse these days with all the different online subscriptions that require credit card information. To keep things secure, Switch includes encryption, two-factor authentication as well as other security features. Currently the startup out of Seattle has 10 employees.

Switch's latest round of funding comes at a time when **FinTech** startups are garnering more attention from investors. Earlier this month **Qapital,** the FinTech startup, raised $12 million in venture funding to expand its app that enables users to make goals and save money to reach those goals. With the app, users can integrate their checking, savings and credit card accounts, so in addition to setting financial goals, they can stay on top of their finances. TechCrunch reported the funding will help increase the number of traditional banking features.

RELATED ITEMS: **CREDIT CARDS**, **FINDING**, **FINTECH**, **STARTUPS**, **SWITCH**, **WHAT'S HOT**

**RECOMMENDED FOR YOU**



# EXHIBIT B



November 22, 2017

Chris Hopen, Founder and CEO
David Pool, Founder
Switch, Inc.
615 2nd Avenue
Suite 600
Seattle, WA 98104
*VIA CERTIFIED US MAIL*

**Re: CEASE AND DESIST**

Dear Switch, Inc.,

I write to inform you that we were recently apprised of your business activities.  As you are likely aware, Switch, Ltd. ("Switch") designs, constructs, and operates the world's most powerful data centers and technology ecosystems. Since Switch commenced operations in early 2000, it has continuously used SWITCH and related trademarks in advertising and promoting its services.  Switch founder, Rob Roy, has over 400 patented and patent pending claims for Switch's services.  The SWITCH brand is well-known and well-respected in the colocation and telecommunications industries.  Switch's customers range from Fortune 100 companies to startups (http://www.supernap.com/clients.html).  Additionally, Switch is the only colocation facility in the world to receive Tier IV Gold Operations certification twice, per to the Uptime Institute (http://uptimeinstitute.com/TierCertification/operational-sustainability-certifications.php).

As we trust you appreciate, Switch has spent years and hundreds of millions of dollars building, advertising and promoting its technology, brand, and the SWITCH marks in print, broadcast media and on the internet through various Switch websites including, but not limited to the following:

| | | |
|---|---|---|
| **switch**.com | **switch**university.com | **switch**projects.com |
| **switch**.net | **switch**nv.com | **switch**.website |
| **switch**.co | **switch**lasvegas.com | **switch**.capital |
| **switch**dcs.com | **switch**lv.com | **switch**.best |
| **switch**supernap.com | **switch**reno.com | **switch**.partners |

In addition to statutory rights, SWITCH has acquired extensive reputational rights to the SWITCH brand in connection with datacenter services, and is entitled to oppose the use of marks which would be likely dilute the distinctive quality of Switch's famous mark and to further cause confusion and deception with the SWITCH mark.  Switch owns U.S. Registration No. **3,229,168** for the service mark SWITCH, "for providing telecommunications connections to a global computer network and colocation services."  Switch also owns

U.S. Registration No. **5,266,044** for the logo **switch**.  The mark SWITCH was first used in commerce as early as **August 31, 2003**.  Switch owns multiple United States Trademark Registrations for its SWITCH related marks. Switch's trademark registrations reflect the longevity and pervasiveness of Switch's brand.

**7135 South Decatur Blvd.  –  Las Vegas, Nevada 89118  –  702.444.4111  –  switch.com**



The result of Switch's promotional efforts has been the establishment of a brand name, and family of marks known to represent the most premier service provider in the telecommunications, colocation, and cloud industries. Such activities have contributed to the notoriety and fame of the SWITCH trademark in the telecommunications and data center industries.

It has come to my attention that Switch, Inc. ("www.switchme.com") is using the name "Switch", "Switchme.com", and the logo ⚡switch to identify services similar to Switch's services, including computer services. Specifically, Switchme's website www.switchme.com not only incorporates the SWITCH trademark owned by Switch, but the website advertises a software application for online account payment profile management. Additionally, you are using SWITCH on your profiles on LinkedIn.

Your use of the trademark SWITCH and the confusingly similar logo ⚡switch is **not** authorized by Switch.

It is of the utmost importance that the SWITCH marks be protected to the fullest extent permitted by law. It is equally important that the public not be deceived into believing that there is some affiliation between Switch's business activities and your own. Upon initial review, these types of activities constitute trademark infringement and could subject you to significant liability. Given Switch's prominence, we are hard pressed to conclude your activities are not intentional, which could give rise to trebled damages, per statute.

Accordingly, we view your unauthorized activities as severe. We must resolve this issue with you immediately. Stop using the trademark SWITCH and the logo ⚡switch in any and all activities related to computer services, telecommunications, or any other service confusingly similar to Switch's service or marks, including on all social media platforms. Also transfer the domain www.switchme.com to Switch. We are willing to discuss potential reimbursement of your direct costs in acquiring the domain.

Switch desires to avoid litigation. Non-responsiveness, delay or public disclosure of this letter will force our hand. **Accordingly, please confirm receipt and respond as soon as possible regarding your compliance but in no event later than by 5:00 pm PST, on Friday, December 1, 2017**.

This letter does not waive legal rights of any kind and Switch reserves all rights to pursue any legal claims against you and any individual, corporation, or entities who are associated or affiliated with your business. Should you have any questions, I can be reached by phone at (702) 623-6801 or by e-mail at abirk@switch.com.

Awaiting your compliance,

Anne-Marie Birk
Associate General Counsel
Switch, Ltd.
702-623-6801

Enclosures

7135 South Decatur Blvd.  –  Las Vegas, Nevada 89118  –  702.444.4111  –  switch.com

# EXHIBIT C

HOME    SERVICES    NEWS    EDUCATION    ABOUT US        Log In    Sign Up

# Switch, Inc. Adds Consumer Payments and Loyalty Executive, Kevin T. Knight, to Its Board of Directors

*Fintech Company Gains Financial Industry Recognition for Its Ability to Redeem Lost Interchange Revenue from the Billions of Credit Cards Reissued Each Year*

LinkedIn

Facebook

Twitter

Reddit

Pinterest

Email

Addthis





SWITCH, INC.

## Release Summary

Gaining financial industry recognition, Switch, Inc. adds consumer payments and loyalty executive, Kevin T. Knight, to its Board of Directors.

Kevin Knight joins Switch, Inc. Board of Directors (Photo: Business Wire)




December 20, 2017 09:07 AM Eastern Standard Time

SEATTLE--(BUSINESS WIRE)--Switch, Inc., a financial technology company offering the first comprehensive platform to solve the credit card managem and replacement problem for consumers, merchants, and card issuers, announced today that the company has added consumer payments and retail loy executive Kevin T. Knight to its Board of Directors.

**Switch, Inc. adds consumer payments and loyalty executive, Kevin T. Knight, to its Board of Directors**

Knight has held many successful leadership roles instituting innovative credit payment products and programs for such high-profile retail brands and financial companies as V Nordstrom, Macy's, Cabela's and GE Capital.

"Kevin's deep understanding of the financial payments industry, consumer behavior and

 Tweet this

levels of customer experience will provide invaluable insights and relationship access toward Switch's business objectives," said Chris Hopen, Founder and CEO of Switch, I

Today's announcement underscores the growing recognition from financial leaders and the credit card and payments industry that Switch is bringing a breakthrough technology solution that addresses a growing problem plaguing the financial industry and killing its profits.

"Switch not only resolves a consumer pain point and impediment to convenient mobile and online commerce, but provides card issuers with significant volume and revenue upside by ensuring that the most updated payment credentials are easily deployed by their customers," said Knight. "I am excited to join the Switch team and support their efforts to provide automated consumer solutions for managing new and updated payment card information where cardholders shop or make payments online."

Knight joins Hopen; Spry Internet-in-a-Box and DataChannel Founder Dave Pool; and accomplished CEO and wireless pioneer Rich Begert, who all sit the board.

Knight joined VISA as Head of Credit and Debit Card Products, North America in 2012 and was instrumental in growing the consumer credit, debit and s business suite, development of new features across all product lines, and expansion of Visa Analytics.

Prior to Visa, Knight was EVP and President of Nordstrom's Credit Division and Chairman/CEO of Nordstrom fsb, a wholly-owned federal savings bank subsidiary. Knight built the retail loyalty program and supporting credit and debit payment products during his tenure with the company.

Knight has also held a variety of leadership positions at GE Capital and served as Senior Vice President at credit Services

Switch acts as an automated assistant to update all consumer online payment accounts. The technology will redeem millions of lost purchasing dollars a interchange revenue for retailers and financial institutions who are hit hard when consumer credit cards are

Switch is the only cardholder solution that uses machine learning technology and is seamlessly implemented and scaled without upending financial institutions' current technology infrastructures. The technology doesn't require opt-in integrations with indivi                  cessors, acquirers or card networks.

Cardholders can start using Switch to manage their online accounts by participating in its ongoing beta pro              tchme.com/sign-up/.

**About Switch, Inc.**

Headquartered in Seattle, Switch is the fastest and easiest way to sign up, sign in, checkout, and switch pa                            your favorite websites. The company's secure, proprietary and patent-pending automation technology gives users the ability to manage and update all of their online accounts in one place. Learn more about Switch at switchme.com or follow the company on Facebook and Twitter.

Switch is led by Chris Hopen, technology veteran and entrepreneur who also founded Tappin, which was a                by Globalscape in 2011. Hopen was a the Co-founder and Chief Technology Officer of Aventail, one of the first SSL VPN companies. Aventail was acquired by Sonicwall in 2007.

Contacts

Switch, Inc.
Katherine Chavez, +1 425-522-3683
press@switchme.com

#payments  #seattle  #tech
#startup  #cardonfile
#consumertech  #banking
#peopleonthemove  #userexperience
#passwords  #fintech
#creditcards  #creditunions
#personalfinance

### Release Versions

English    EON: Enhanced Online News

### More News

### Contacts

Katherine Chavez, +1 425-522-3683
press@switchme.com

---

  

**More from Business Wire:**   Blog    Apps    UK/Ireland    Deutschland    France    Hong Kong    Italy    Japan    EON: Enhanced Online News

Tradeshownews.com    PYMNTS.com

Contact Us    Privacy Statement    Terms of Use    © 2017 Business Wire, Inc.

# EXHIBIT D



Finance

**Switch Inc** (NYSE:SWCH)                                                                Add to Portfolio     **More results**

Company

Summary
News
Related companies
Financials

Markets

News

Portfolios

Stock screener

Google Domestic Trends

Recent Quotes (30 days)

                    chg | %

SWCH    17.57  +0.470



**17.57** +0.47 (2.75%)
After Hours: 17.60 +0.03 (0.17%)
Dec 21, 5:19PM EST
NYSE real-time data - Disclaimer
Currency in USD

| | | | |
|---|---|---|---|
| Range | 17.11 - 17.59 | Div/yield | 0.01/0.96 |
| 52 week | 15.77 - 24.90 | EPS | 0.14 |
| Open | 17.11 | Shares | 35.94M |
| Vol / Avg. | 879,015.00/1.21M | Beta | - |
| Mkt cap | 4.44B | Inst. own | 0% |
| P/E | 124.02 | | |

G+

| | | | |
|---|---|---|---|
| Dow Jones | 24,782.29 | 0.23% | |
| S&P 500 | 2,684.57 | 0.20% | |
| Technology | | -0.20% | |
| SWCH | 17.57 | 2.75% | |

Compare: [Enter ticker here]  [Add]   ☐ Dow Jones ☐ S&P 500 ☐ INAP ☐ FULO ☐ TLEIY ☐ AKAM ☐ RAX   more »



Zoom: 1d 5d 1m 3m 6m YTD 1y 5y 10y All
Nov 22, 2017 - Dec 21, 2017 -0.5 (-2.77%)

Volume (thous / 30min)

Settings | Technicals | ⚙ Link to this view

Volume delayed by 15 mins.

**News**                                          Relevance | Date

**A** Switch, Inc. Adds Consumer Payments and
Loyalty Executive, Kevin T. Knight, t...
Business Wire - Dec 20, 2017

**B** Switch, Inc. Announces Quarterly Dividend
PR Newswire - Dec 7, 2017

**C** Switch: Risk-Reward Improves, Still A Long
Way To Go
Seeking Alpha - Nov 30, 2017

**D** Two sizzlers stock's are not to be missed:
Kindred Healthcare, Inc. (KND ...
StockNewsJournal - 13 hours ago

**E** Choosing Between ServiceNow, Inc. (NOW)
and Switch, Inc. (SWCH)
StockNewsGazette - Dec 20, 2017

**F** Setting Up Technical Traps: Switch, Inc.

All news for Switch Inc »              Subscribe 🔊

Advertisement



# EXHIBIT E

| | | |
|---|---|---|
| **From:** | Feather Lake | |
| **To:** | Feather Lake | |
| **Subject:** | RE: Request to contact NYSE | |
| **Date:** | Wednesday, February 28, 2018 12:07:55 PM | |
| **Attachments:** | image001.png | |



**FEATHER LAKE**
SENIOR PARALEGAL

o  +1 (702) 425-8429
m  +1 (702) 239-7618
e  feather@switch.com

**From:** Christopher Ix <cix@switch.com>
**Date:** Tuesday, February 27, 2018 at 12:32 PM
**To:** Irmina Blaszczyk <irmina@blueshirtgroup.com>
**Cc:** Gabe Nacht <gabe@switch.com>, Thomas Morton <thomas@switch.com>, Sam Castor <sam@switch.com>
**Subject:** Request to contact NYSE

Hi Irmina,

This morning I received a misleading Switch news article below from the NYSE Connect newsfeed.  Although the article states "Switch" and references the "SWCH" ticker, I believe the article is referring to a company called Switchme.com. Could you please contact NYSE to see if this can be rectified.

Thanks,

Chris

News: AM MONDAQ7ac5352f6e924eee8 02/27/18 10:13:24 AM

▼ Switch Launches 'CardSavr'.

| Date: | 02/27/18 |
| Time: | 06:08:30 AM |
| Service: | AM |
| Story ID: | GALEfb58fa2d57b259e1b5c |
| Symbols: | SWCH-BQ, SWCH, GSB |

**Switch Launches 'CardSavr'.**

---

**Tue Feb 27 09:08:30 2018 EDT**

Switch has launched its proprietary Application Program Interface (API), "CardSavr".

The Company said that the CardSavr ROI (return on investment) model is structured specifically to increase revenue or redeem the significant revenue lost by issuers and merchants. Due to loss, theft and fraud billions of credits cards are reissued each year. The API also provides visibility to track and increase the usage of newly issued cards.

"Until CardSavr, banks and merchants were held hostage by archaic credit card networks' issuing and replacement processes and the inability alone to digitally help their cardholders manage online payments," said Chris Hopen, Chief Executive Officer of Switch, Inc. "This is the first time an API provides all card brands with direct control over a large source of potential and/or lost revenue. Our platform increases both their bottom line around credit card circulation issues and enhances cardholders' online purchasing experiences. All parties of the e-commerce ecosystem benefit."

Switch reported that the CardSavr API already supports thousands of online merchants, and by using anonymized crowdsourcing techniques coupled with its machine learning engine, the number of Switch-enabled merchant sites grows every day. CardSavr assists e-commerce sites without any need for integration by the merchants, resulting in a far greater reach for card updates than conventional methods currently employed by the card networks.

CardSavr's design brings many first-time benefits to card issuers:

-Immediate validation of customer card use

-Recaptured and increased revenue during the reissuing process

-Increased new card activations

-Provide cardholders an easier way to update cards at merchant sites

Financial executives who participated in the company's focus groups recognized potential for their businesses and customers. "The Switch application is extremely easy to use and provides a much faster way to pay and shop at card-on-file sites," added Mark Morrison, President and CEO of MountainCrest Credit Union and a focus group participant of the Switch application. "We appreciate how secure the technology is in terms of protecting users, their identities and activity, while helping to manage card activity online. We can envision how our members would find this technology extremely valuable and how the credit union could also benefit from an operational standpoint."

Switch CEO Chris Hopen is a technology veteran and entrepreneur who also founded Tappin, which was acquired by Globalscape in 2011. Hopen was also the Co-founder and Chief Technology Officer of Aventail, one of the first SSL VPN companies. Aventail was acquired by Sonicwall in 2007. Co-founder Dave Pool is founder of several successful technology companies, such as Spry Internet-in-a-Box and Data Channel.

More information:

www.cardsavr.com

switchme.com

((Comments on this story may be sent to newsdesk@closeupmedia.com))



**CHRISTOPHER IX**
DIRECTOR OF FINANCIAL PLANNING AND ANALYSIS

o  +1 (702) 479-3886
m  +1 (702) 305-1244
e  cix@switch.com

# EXHIBIT F



Screen shot of:

https://www.google.com/search?q=new+york+stock+exchange+ticker+symble+swch&rlz=1C1GGRV_enUS751US751&oq=new+york+stock+exchange+ticker+symble+swch&aqs=chrome..69i57.7060j0j4&sourceid=chrome&ie=UTF-8

# EXHIBIT G



For Sales Call: 1-800-371-2059

All Other Inquires: 1-877-448-9378



# Partner with Flexential for scalable, tailored colocation in Nevada

Enterprise-grade infrastructure with a 100% uptime commitment.

Our Las Vegas area data centers offer secure, reliable hybrid IT solutions from colocation & cloud to disaster recovery & managed services.

**Learn more**

Secure cabinets starting at **[$729/month]**

Free physical migration service offer for new customers

Get in touch with us to see if you qualify



## Nevada Colocation

**Download Tour Guide**

Market capacity

510,000+ square-foot data center footprint
144,000+ square-foot data center footprint

2 Nevada data centers

Locations in Downtown and North Las Vegas

Power density

150+ watts per square foot

Backed by our 100% uptime commitment

## When it comes to

## we have the hands you can rely on.

We understand the costs of downtime. With 100% uptime commitment and 24/7 hands-on service, we treat your IT as if it were our own. Contact us today.







### Fast, dependable network

With a 100% uptime guarantee, our 100 gigabit core network backbone is built to accommodate large traffic spikes without sacrificing connectivity, latency, or application performance.

### Leave your day-to-day IT management to us

Our full suite of managed services include Disaster Recovery, Managed Cloud, Network Management, and Managed Colocation. Our team works 24/7 to ensure peak performance.

### Tackle Operational Challenges

Our team brings practical expertise to IT operations, including compliance, security, stability, and other operational issues that may impact your business.

Request a Quote

# 41 data center campuses.
# One dependable network.





## Nevada
## 2 Data Centers near Las Vegas

Our state-of-the-art data centers offer powerful core-to-core edge coverage from coast to coast and a spectrum of IT support and expertise.

Request a Quote

> ""

# What Our Customers Say

Talk to us about creating a tailored colocation solution for your IT infrastructure.



Request a Quote

© Flexential 2019

# EXHIBIT H



# 7 reasons why colocation makes sense for your business

*By SHI Staff*   *Posted October 8, 2015*   *In Data Center, Hardware, Professional Services, Solutions*

1

Data centers are a lot like cafeterias for most organizations — a necessity, but not something they want to manage. Frankly, most organizations are not in the business of making sandwiches or building and managing data centers. Owning and operating an in-house data center is just not aligned with their core business.

Compared with operating an in-house data center, leveraging colocation services from a data center provider offers numerous benefits that have driven steady adoption of these services over the years. Here are seven reasons why you should consider colocation data center services for your organization.



**1. Predictable cost structures and cost savings.** A data center built for one company is expensive. A data center built for many organizations brings down the cost for every firm using it. Organizations moving into colocation data centers are leveraging these economies of scale by avoiding expensive capital expenditures for a fixed operating expenditure model.

In-house data centers require huge capital to build, and many organizations still fall short of the higher levels of redundancy found in commercial colocation data centers. Costs mount for in-house support staff, as well as budgets for additional expansion as needed.

Moving to a colocation center is also generally less expensive than a cloud solution for organizations with heavy hardware utilization and longer refresh cycles. It's the difference between using a taxi each day for a long commute and owning a car – taxis are great for short, infrequent trips, but buying a car generally makes better economic sense for a daily long-distance commute. Organizations want pricing stability, which is something they can't get in every cloud environment; the variability in these services' costs from month to month can make it difficult to properly budget for them. In addition, it's generally cheap to put data into the cloud, but can be surprisingly expensive to get it back when a random disaster strikes.

**2. 100 percent uptime.** Commercial colocation data centers have near-100 percent uptime because of the redundancies built into their facilities – a benefit most organizations cannot achieve in house. A good colocation data center will be equipped with a fully fault-tolerant network, uninterruptible power supply (UPS), emergency backup generators, and HVAC systems that ensure customers won't go down during a natural disaster. Redundancies also allow the colocation provider to perform maintenance without taking a single customer offline.

**3. Scalability.** Colocation facilities allow customers to quickly scale up their footprint based on their company's growth. Adding racks – one or 100 – is easy and generally more cost effective for growing organizations than expanding an in-house data center.

**4. Support.** Data centers have support teams ready 24/7/365 to manage customer needs. Additionally, most colocation centers offer general smart hands services, such as replacing hard drives, physical reboots, and cabling of systems. Many data center providers now offer fully managed support services, which can provide monitoring, maintenance, and management of the customers' OS and application layers. With colocation, organizations no longer need to worry about patch management and other support functions that consume so much time of their IT staff.

This level of support and regular maintenance would prove prohibitively expensive for most organizations to handle internally. Rather than supporting the day-to-day operations of a data center, IT employees can be placed in more strategic roles within their company, and leave the day-to-day to the colocation provider.

**5. Compliance.** Compliance has become a centerpiece of data planning. In the financial and health care verticals especially, it is exceedingly expensive to maintain compliant in-house data centers. Using a commercial colocation data center facility enables organizations to more easily and cost effectively maintain compliance with ever-changing federal regulations and industry standards. Many colocation facilities adhere to the specific administrative, physical, and technical safeguards set by the HITECH Act and are HIPAA compliant.  Many data center providers also offer HIPAA- and PCI-compliant disaster recovery (DR) services. While the public cloud continues to grow in popularity, many financial and health care institutions still aren't ready to put their most sensitive data into it. Colocation remains a popular, compliant option.

**6. Security.** Colocation data centers provide 24/7/365 security. With perimeter fences, armed guards, restricted access badge access lists, mantrap doors, biometric security, and CCTV camera systems, commercial colocation data centers are extremely secure facilities. On the network side, many providers now offer intrusion detection, intrusion prevention, and firewall services to reduce attacks. Organizations need secure environments, as no customer wants to make headlines for another data breach.

**7. Disaster Recovery.** Many customers have a primary data center in use today. But what if it goes down like many in-house data center facilities did in superstorm Sandy? Colocation facilities allow customers to colocate servers for disaster recovery replication or leverage additional disaster-recovery-as-a-service (DRaaS) offerings from the data center provider.

**Other benefits to colocation**

What other factors do you consider when searching for a colocation center? What additional questions do you have? Let us know in a comment below.

## Related Posts: You may also be interested in...



Enterprise chatbots: The helpful coworker your employees need



5 steps to become a data-driven enterprise



Microsegmentation begins with planning. Here's how to get started



How SHI is managing IT for health care … and other organizations

Colocation , Data Center

**SHI Staff**

# COMMENTS

**Derek Dewitt**    September 30, 2017    Reply

I can see why a company would want to move to a colocation center so they can keep expenses down and expand faster. I like that you mention how it's also generally less expensive than a cloud solution for organizations. This sounds like an investment that will pay itself off in the long run. Thanks for sharing!

## LEAVE A COMMENT

Name (Required)

Email (Required)

Website

☐ Save my name, email, and website in this browser for the next time I comment.

Please enter an answer in digits:

4 + 4 =

POST COMMENT

Current ye@r *  5.3

## Popular Posts



**The case for cloud rightsizing: Don't get caught with your head in the clouds**



**The last-minute guide to GDPR: How to find and fix your biggest compliance risks**

**The top 20 tech conferences to attend in 2019**



**Enterprise chatbots: The helpful coworker your employees need**

## Get SHI Updates Sent Right To Your Inbox. Never Miss A Post!

Enter your email address

**Socialize With Us**



Subscribe to the SHI Blog          Connect With Us

Product, program, and IT industry
news, right to your inbox!

Enter your email address

© 2018 SHI International Corp. All Rights Reserved. This site is owned and maintained by SHI for the use of its customers. | Privacy Policy

# EXHIBIT I

MarketWatch site logo
svg1{fill:#ffffff;}
svg2{fill:#00AC4E;}

Sign Up    Log In

**MarketWatch, meet Barron's**                                          ✕

MarketWatch is pleased to bring you Barron's. You can enjoy full access to Barron's coverage on
MarketWatch with a Barron's subscription. Already a Barron's subscriber? Sign in.

See the Latest          Subscribe

**Home**

PRESS RELEASE

# Data Center Market - Global Outlook and Forecast 2018-2023

By

Published: Dec 11, 2018 4:01 p.m. ET

SHARE

NEW YORK, Dec. 11, 2018 /PRNewswire/ -- This market research report on global data center market offers analysis on market size & forecast, market share, industry trends, growth drivers, and vendor analysis. ==The market study also includes insights on segmentation by== electrical infrastructure (UPS systems, generators, transfer switches & switchgear, rack PDU, and other electrical infrastructure), by mechanical infrastructure (cooling systems, rack, and other infrastructure), by IT infrastructure (server, storage, and network), ==by tier standard (Tier 1 & 2, Tier 3, and Tier 4),== by general construction (building development, installation and commissioning services, building design, physical security, and DCIM), ==and by geography (North America, Europe, APAC, Latin America, and MEA).==

Read the full report: https://www.reportlinker.com/p05398686

**Data Center Market - Overview**

The increasing focus in the adoption of advanced technologies such as cloud-based services and IoT will augment the growth of the global data center market. The construction of hyperscale facilities spanning with an area of over 200,000 square feet across the globe will create lucrative opportunities for leading vendors operating in the global market. Companies such as Facebook, Google, Amazon Web Services (AWS), and Microsoft are amongst the largest companies focusing on the development of modular and hyperscale data center construction facilities. ==Colocation providers are investing millions of dollars and are focusing on the APAC and Middle East regions towards the deployment of new facilities.== The increasing investments towards the development of a digital economy by laying submarine fiber cables, improving rural and urban

broadband connectivity, and aiding in the establishment of new facilities that enable technological advancements will drive the demand in the global market. The extensive use of 4G LTE technology and upcoming 5G rollouts will increase the internet penetration and drive the growth of the global market. The emergence of edge computing is one of the primary factors fostering facilities development in secondary data center marketsacross the globe. The extensive use of services such as cloud, big data, IoT and artificial intelligence is prompting operators to adopt high-performance mission critical IT infrastructure in the global data center market.

The increasing efforts to reduce power consumption, carbon emissions, and promote operational efficiency will attribute to the adoption of energy-efficient infrastructure in the global market. The leading vendors are investing in development of design innovation and implementation of advanced cooling systems is propelling the growth of the market. The global data center market is estimated to reach revenues of around $174 billion by 2023, growing at a CAGR of approximately 4% during the forecast period. The research report also offers market size in square ft area and power capacity in megawatts (MW) across geographies.

**Data Center Market - Dynamics**
The adoption of hyperconverged infrastructure will have a higher impact on the growth of global data center market because it enables operating software defined data center (SDDC) environments. Most of the vendors in the market are involved in innovating its hyperconverged infrastructure (rack scale system) offerings that include necessary hardware and software to process workloads with added simplicity, flexibility, scalability and affordability. Several enterprises are focusing on the adoption of colocation spaces comprising 1-10 rack systems, will prefer to procurement of converged or hyperconverged systems. However, it is dependent on the cost of these systems and the operational needs. The use of these systems can reduce the IT administrative tasks considerably. Predominant use case of hyperconverged infrastructure is virtual desktop infrastructure (VDI) solutions. However, the use of these platforms for other workloads, especially in a hybrid cloud environment is growing rapidly. Increase deployment of cloud workloads such as artificial intelligence (AI), IoT, and big data will aid the growth of converged and hyperconverged infrastructure in the global data center market during the forecast period.

**Data Center Market - Segmentation**
This market research report includes a detailed segmentation of the market by electrical infrastructure, mechanical infrastructure, IT infrastructure, tier standard, general construction, and geography.

**Data Center Market – By Electrical Infrastructure**
Increase in deployment of fuel cells might have a major negative impact on the global data center market

The global data center market by electrical infrastructure is divided into UPS systems, generators, transfer switches & switchgear, rack PDU, and other electrical infrastructure. UPS systems dominated the market size in 2017, growing at a CAGR of more than 6% during the forecast period. The leading infrastructure

providers are procuring modular rack level UPS systems that can support only that infrastructure with a capacity of up to 40 kW in the global market. Moreover, the implementation of UPS systems per data hall with capacity of around 2-3MW per hall to provide redundant backup power during an outage will attribute to the growth of this segment in the global market. The top operators are investing in the development of innovative UPS systems to reduce power wastage during conversion, improve their efficiency, and lower the OPEX through lesser maintenance cost. The cost of procuring lithium-ion UPS systems will continue to decline during the forecast period, growing the market for facilities USPs systems in the global data center market.

**Data Center Market – By IT Infrastructure**
Demand for mission-critical servers, all-flash arrays, hybrid storage arrays, 25/50GbE Ethernet switch ports will grow in the global data center market during forecast period

The IT infrastructure segment in the global data center market is classified into server, storage, and network. The server infrastructure occupied majority of the market share in 2017, growing at a CAGR of around 2% during the forecast period. The top operators are focusing on adoption of server infrastructurethat best suit their workload needs. The selection of server infrastructure primary depends on factors such as form factors, energy consumption, and virtualization technologies in the global market. In the server segment the processor based on x86 architecture dominates the market with around 85% of the share. The vendors are offering servers suitable for cloud infrastructure comprising multicore processors, and high capacity memory to grow it the adoption rate in the global data center market. The companies also prefer severs that can enable them to reduce space in the facilities environment meanwhile providing higher performance. The adoption of server infrastructure based on open community project (OCP) designswill attribute to the growth of IT infrastructure in the global data center market. This research report also includes market size analysis on hard disk drives (HDD), solid state drives (SSD), all flash array systems, hybrid array systems, and shipment of server and network switches (1/10/25/40/50/100 GbE).

**Data Center Market – By Mechanical Infrastructure**
Free cooling technique will grow in the US and European Continent, where APAC region will be dominated by water-based cooling techniques in the global data center market

The global data center market by mechanical infrastructure is segmented into cooling systems, rack, and other infrastructure. Cooling systems segment to dominate the market share in 2017, growing at a CAGR of over 5% during the forecast period. The use of indirect evaporative cooler and air or water-side economizers across countries with colder climatic conditions will propel the growth of this segment in the global market. The integration of 2N redundant cooling systems across Tier 3 facilities will revolutionize the global market. The leading vendors are offering Energy Star certified systems with in-built redundant cooling capacity to attract customers in the market. The operational metrics such as power usage effectiveness (PUE), water-usage effectiveness (WUE), and carbon usage effectiveness (CUE) are gaining immense importance in the

global data center market.

## Data Center Market – By General Construction

Design of sustainable facilities environment with PUE of less than 1.3 coupled with integration of AI and remote monitoring to grow in the global data center market

The general construction segment in the global data center market is categorized into building development, installation and commissioning services, building design, physical security, and DCIM. Physical security segment occupied a considerable market share in 2017, growing at a CAGR of over 9% during the forecast period. The installation of security systems that comprise of sensors that are integrated with the existing DCIM solutions for real-time remote monitoring benefits will propel the growth of this segment in the global market. The facilities operators are opting for analytics of video surveillance recording and protecting facilities from EMP and lightning during natural disasters in the global market. The integration of robot monitoring systems with sensor and video surveillance in various facilities across the world will propel the growth of the global data center market.

## Data Center Market – By Tier Standards

The construction of Tier 3 facilities dominates the market and flexible design pattern are being followed to add more redundancy on support infrastructures in the global data center market

The global data center market by tier standards is segmented into Tier 1 & 2, Tier 3, and Tier 4. Tier 3 standard facilities dominated the market share in 2017, growing at a CAGR of more than 5% during the forecast period. Most of the new facilities deployment in the market are of Tier 3 standards with a minimum of N+1 redundancy. The operators are also offering facilities that can be reconfigured with up to 2N+1 redundancy as the demand arises to sustain the competition in the global data center market. The investment in Tier 3 facilities is about $780 per square feet, where the construction cost varies based on the facility location. This entirely depends on the redundancy adopted by infrastructure, with a minimum of N+1. The construction of Tier 4 facilities is expected to experience significant growth in the global data center market during the forecast period.

## Data Center Market – By Geography

Latin America and MEA will experience higher compound annual growth rate in the global data center market during forecast period

The geographical segmentation in the global data center market is classified into North America, Europe, APAC, Latin America, and MEA. Americas occupied the largest market share in 2017, growing at a CAGR of over 2% during the forecast period. The billion dollar investments by colocation providers, hyperscale operators, enterprises, and government agencies is propelling the growth of the Americas in the global market. The US dominates the market when it comes to adoption of innovative infrastructure solutions such

as all-flash arrays, hybrid arrays and hyperconverged infrastructure solutions. The increasing interest to procure renewable energy sources and low power cost sources will encourage operators to invest in the development of the market in Americas. The adoption of 2N redundancy configuration will grow among UPS systems and PDUs, while generators and cooling systems are still adopting N+1 or N+N configurations in the Americas. Innovations in power sources such as lithium-ion UPS systems, DRUPS, and fuel cells will propel the development of this region in the ==global data center market==.

**Key Countries Profiled**
**The key countries profiled in the report are:**
• US
• Canada
• Western Europe
• Nordic Region
• Eastern Europe
• China & Hong Kong
• Australia
• Singapore

**Key Vendor Analysis**
==The global data center market== comprises of various vendors who control the level of competition. The market comprises of multiple participants in the vendor space. The vendors in this report is categorized in to three participants namely,
• Data Center Critical (IT) Infrastructure Providers: It include companies that sell IT infrastructure such as server, storage and network products.
• Data Center Support Infrastructure Providers: It includes vendor involved in providing power, cooling, rack, security, and infrastructure management products.
• Data Center Construction Contractors: It include general contractors, and sub-contractors involved in design, project management, installation and commissioning services of facilities infrastructure

Multiple innovations are carried out by vendors operating in each space. IT infrastructure vendors are focusing on providing solutions that best suits business operational environments. Power players are focusing on efficiency, cooling players focusing on reducing power consumption, and architectural firms are incorporating innovative design to gain larger global data center market share over the next few years.
==**The major vendors in the global market are:**==
• By IT Infrastructure Providers
• HPE
• Cisco
• Dell Technologies

- IBM
- **Huawei**
- By Support Infrastructure Providers
- ABB
- Eaton
- Rittal
- Schneider Electric
- STULZ
- Vertiv
- Caterpillar
- **Cummins**
- By Facilities Operators
- AECOM
- DPR Construction
- HDR Architecture
- Holder Construction
- Jacobs Engineering Group
- Mercury Engineering
- M+W Group

Other prominent vendors include Arista, Atos, Broadcom, Extreme Network, Hitachi Vantara, Inspur Group, Inventec, Juniper, Lenovo, NEC, NetApp, Oracle, Pure Storage, Quanta Computer, Super Micro Computer, Wistron, Airedale Air Conditioning, Alfa Laval, Altima Technologies (NetZoom), Bosch Security Systems (Robert Bosch), Condair Group, Delta Group, GE, Legrand, Nlyte Software, Mitsubishi Electric Corporation, MTU On Site Energy, Socomec Group, Trane (Ingersoll Rand), Arup Group, Cap Ingelec, Corgan, CSF Group, Fluor Corporation, Fortis Construction, Gensler, Gilbane Building Co., Jones Engineering Group, KKR Investment Group, Morrison Hershfield, Mortenson Construction, Structure Tone, Syska Hennessy Group, and Whiting-Turner Contracting

**Key market insights include**
1. The analysis of global data center market provides market size and growth rate for the forecast period 2018-2023.
2. It offers comprehensive insights on current industry trends, trend forecast, and growth drivers about the global data center market.
3. The report provides the latest analysis of market share, growth drivers, challenges, and investment opportunities.
4. It offers a complete overview of market segments and the regional outlook of global data center market.
5. The report offers a detailed overview of the vendor landscape, competitive analysis, and key market strategies to gain competitive advantage.

**Report Snapshot**

The global data center market size is expected to reach revenues of around $174 billion by 2023, growing at a CAGR of about 4% 2018–2023.

The global data center market is driven by increasing investments made by hyperscale developers such as Apple, Facebook, Google, AWS, Microsoft, Alibaba, Baidu, OVH, and China Telecom. The focus on developing a digital economy is one of the primary factors attributing to the increasing demand in the global data center market. The market research report provides in-depth market analysis and segmental analysis of the global data center market by electrical infrastructure, mechanical infrastructure, IT infrastructure, tier standard, general construction, and geography.

Base Year: 2017
Forecast Year: 2018–2023

The study considers the present scenario of the global data center market and its market dynamics for the period 2018?2023. It covers a detailed overview of several market growth enablers, restraints, and trends. The report covers both the demand and supply side of the global data center market. Also, the study profiles and analyzes 19 leading and 49 other prominent market participants across infrastructure vendors, data center general construction contractors, and colocation providers operating in the global data center market.

**Major Vendors in the Global Data Center Market**
• By IT Infrastructure Providers
• HPE
• Cisco
• Dell Technologies
• IBM
• **Huawei**
• By Support Infrastructure Providers
• ABB
• Eaton
• Rittal
• Schneider Electric
• STULZ
• Vertiv
• Caterpillar
• **Cummins**
• By Facilities Operators

- AECOM
- DPR Construction
- HDR Architecture
- Holder Construction
- Jacobs Engineering Group
- Mercury Engineering
- M+W Group

**Other Prominent Players in the Global Data Center Market**
- By Other Critical Infrastructure Providers
- Arista
- Atos
- Broadcom
- Extreme Network
- Hitachi Vantara
- Inspur Group
- Inventec
- Juniper
- Lenovo
- NEC
- NetApp
- Oracle
- Pure Storage
- Quanta Computer
- Super Micro Computer
- **Wistron**
- By Other Prominent Infrastructure Providers
- Airedale Air Conditioning
- Alfa Laval
- Altima Technologies (NetZoom)
- Bosch Security Systems (Robert Bosch)
- Condair Group
- Delta Group
- GE
- Legrand
- Nlyte Software
- Mitsubishi Electric Corporation
- MTU On Site Energy
- Socomec Group

- **Trane (Ingersoll Rand)**
- Other Prominent Construction Contractors
- Arup Group
- Cap Ingelec
- Corgan
- CSF Group
- Fluor Corporation
- Fortis Construction
- Gensler
- Gilbane Building Co.
- Jones Engineering Group
- KKR Investment Group
- Morrison Hershfield
- Mortenson Construction
- Structure Tone
- Syska Hennessy Group
- Whiting-Turner Contracting

## Data Center Market Segmentation by Electrical Construction
- UPS systems
- Generators
- Transfer Switch and Switchgear
- Rack PDU
- Other Electrical Infrastructure

## Market Segmentation by Mechanical Infrastructure
- Cooling Systems
- Rack
- Other Infrastructure

## Market Segmentation by IT Infrastructure
- Server Infrastructure
- Storage Infrastructure
- Network Infrastructure

## Market Segmentation by Cooling Systems
- CRAC & CRAH Systems
- Chillers

• Cooling Towers & Dry Coolers
• Economizer & Evaporative Coolers
• Other Cooling Units

**Global Data Center Market Segmentation by Cooling Technique**
• Air-based Cooling Technique
• Liquid-based Cooling Technique
• Direct Liquid and Immersion Cooling Techniques
• Water-based Cooling Technique

**Market Segmentation by General Construction**
• Building Development
• Installation & Commissioning
• Building Design
• Physical Security
• DCIM

**Market Segmentation by Tier Standard**
• Tier 1 and Tier 2
• Tier 3
• Tier 4

**Market Segmentation by Geography**
• North América
• US
• **Canada**
• Europe
• Western Europe
• Eastern Europe
• **Nordic Region**
• APAC
• China
• Hong Kong
• Austràlia
• **Singapore**
• Latin America
• MEA

Read the full report: https://www.reportlinker.com/p05398686

About Reportlinker

ReportLinker is an award-winning market research solution. Reportlinker finds and organizes the latest industry data so you get all the market research you need - instantly, in one place.

_____

Contact Clare: clare@reportlinker.com
US: (339)-368-6001
Intl: +1 339-368-6001

View original content:http://www.prnewswire.com/news-releases/data-center-market---global-outlook-and-forecast-2018-2023-300763563.html

SOURCE Reportlinker

Copyright (C) 2018 PR Newswire. All rights reserved

*The MarketWatch News Department was not involved in the creation of the content.*

## FROM MARKETWATCH

Aurora stock falls as earnings show cannabis company's investments are still the big earners

Dow sinks 602 points as the stock market contends with a fresh threat: a rising dollar

Tips from a guy who managed to live in Manhattan on a $40,000 salary and still max out his 401(k) contributions

## MARKETWATCH
## PARTNER CENTER



BACK TO TOP

**MARKETWATCH**

Site Index

Topics

Help

Feedback

Newsroom Roster

Media Archive

Premium Products

Mobile

**COMPANY**

Company Info

Code of Conduct

Corrections

Advertising Media Kit

Advertise Locally

Reprints & Licensing

Your Ad Choices

**DOW JONES NETWORK**

WSJ.com

Barron's Online

BigCharts

Virtual Stock Exchange

Financial News London

WSJ.com Small Business

realtor.com

Mansion Global

Copyright © 2019 MarketWatch, Inc. All rights reserved.

By using this site you agree to the Terms of Service, Privacy Policy, and Cookie Policy.

☐

☐

☐



Intraday Data provided by SIX Financial Information and subject to terms of use. Historical and current end-of-day data provided by SIX Financial Information. All quotes are in local exchange time. Real-time last sale data for U.S. stock quotes reflect trades reported through Nasdaq only. Intraday data delayed at least 15 minutes or per exchange requirements.

# EXHIBIT J



Search for Report **SEARCH**

You are here: Home > Market Reports > *Data Center Market - Global Outlook and Forecast 2018-2023*

**ZE THE REPORT**

**REQUEST SA**



**REGIONAL REPORT**

## Data Center Market - Global Outlook and Forecast 2018-2023

☐ *Jun-2018*    Pages: *400*

*SKU:* **ARZ180601**

*Tags:* *Arista , Atos , Hitachi Vantara , Inspur , Inventec , Extreme Network , Juniper , Super Micro Computer , Wistron , Altima Technologies (NetZoom) , MTU On Site Energy , Corgan , Socomec Group , Condair Group , KKR Investment Group (Aceco TI S.A.) , M+W Group , Bosch Security Systems (Robert Bosch) , Trane (Ingersoll Rand) , Vertiv , Structure Tone , Mortenson Construction , Morrison Hershfield , Gilbane Building Co , Fortis Construction , Fluor Corporation , Nlyte Software , Cummins , Caterpillar , Syska Hennessy Group , ABB , NetApp , Arup Group , Gensler , HDR Architecture , Jones Engineering , General Electric , AECOM , Mitsubishi Electric Corp. , DPR Construction , Holder Construction , NEC , Jacobs Engineering , CSF group , Mercury Engineering , Stulz , The Whiting-Turner Contracting. , Alfa Laval , Airedale , Eaton , Delta Group , Legrand , Lenovo , Dell , Oracle , Pure Storage , Huawei , IBM , Quanta Computer , Schneider Electric , Cisco System , Rittal , Hewlett Packard Enterprise (HPE) , Broadcom .*

| Select License Type |
|---|

◉ *Single License*    $4500



○ *Team License*                                                              $5000

○ *Corporate License*                                                     $5500

<div style="border:1px solid #888; display:inline-block; padding:6px 20px;">ADD TO CART</div>

**Want to have a Sample report, before the purchase ?**        <span style="background:#e8601c; color:#fff; padding:8px 20px;">**REQUEST SAMPLE**</span>

| **DESCRIPTION** | REPORT SNAPSHOT | TABLE OF CONTENTS | LIST OF EXHIBITS |
| --- | --- | --- | --- |

This market research report on global data center market offers analysis on market size & forecast, market share, industry trends, growth drivers, and vendor analysis. The market study also includes insights on segmentation by electrical infrastructure (UPS systems, generators, transfer switches & switchgear, rack PDU, and other electrical infrastructure), by mechanical infrastructure (cooling systems, rack, and other infrastructure), by IT infrastructure (server, storage, and network), by tier standard (Tier I & II, Tier III, and Tier IV), by general construction (building development, installation and commissioning services, building design, physical security, and DCIM), and by geography (North America, Europe, APAC, Latin America, and MEA).

### Key highlights of global data center market:

- The major drivers of data center market growth are increase in data, rising number of social media users, connected reality, and higher penetration of smart devices.
- Innovations in cooling systems, development of tropical and underwater facilities, and battery technology is expected to revolutionize the market landscape.
- Renewable energy source contribute to the mega data center development. Initiatives like RE100 will play a role in the use of renewable energy among data centers.
- The investments in more than 30 submarine cable projects will majorly  boost data center development across developing countries, specifically in the APAC region.
- Countries such as the US, the UK, France, Germany, China, and Japan will be the major contributor towards the adoption of high-performance infrastructure that enables processing of mission-critical workloads.

**Data Center Market - Overview**

The increasing focus in the adoption of advanced technologies such as cloud-based services and IoT will

augment the growth of the global data center market. The construction of **hyperscale facilities** spanning with an area of over 200,000 square feet across the globe will create lucrative opportunities for leading vendors operating in the global data center market. Companies such as Facebook, Google, Amazon Web Services (AWS), and Microsoft are amongst the largest companies focusing on the development of **modular** and **hyperscale datacenter** construction facilities. **Colocation providers** are investing millions of dollars and are focusing on the APAC and Middle East regions towards the deployment of new facilities. The increasing investments towards the development of a digital economy by laying **submarine fiber cables**, improving rural and urban broadband connectivity, and aiding in the establishment of new facilities that enable technological advancements will drive the demand in the global data center market. The extensive use of **4G LTE technology** and upcoming 5G rollouts will increase the internet penetration and drive the growth of the global data center market. The emergence of edge computing is one of the primary factors fostering facilities development in **secondary data center markets** across the globe. The extensive use of services such as cloud, big data, IoT and artificial intelligence is prompting operators to adopt high-performance mission critical IT infrastructure in the global data center market.

The increasing efforts to reduce **power consumption**, carbon emissions, and promote operational efficiency will attribute to the adoption of energy-efficient infrastructure in the global data center market. The leading vendors are investing in development of design innovation and implementation of advanced cooling systems is propelling the growth of the  data center market. *The global data center market is estimated to reach revenues of around $174 billion by 2023, growing at a CAGR of approximately 4% during the forecast period. The research report also offers market size in square ft area and power capacity in megawatts (MW) across geographies.*



# GLOBAL DATA CENTER MARKET

www.arizton.com

## DATA COVERAGE

- Market Size by Revenue | 2017-2023
- Market Size by Power Capacity | 2017-2023
- Market Size by Square Feet Area | 2017-2023
- Macro Economic Factors Enabling Market Growth
- Latest Trends, Drivers, and Restraints
- Geographical Analysis by Regions and Top Countries

## MARKET SIZE BY REVENUE 2023 ~ $174 BILLION CAGR ~ 4%



## COMPETITIVE LANDSCAPE

- IT Infrastructure
- Server Infrastructure
- Storage Infrastructure
- Network Infrastructure
- Electrical Infrastructure
- Mechanical Infrastructure
- General Construction

20 Leading Vendors Identified

44 Prominent Players Operating in the Market

## MARKET SEGMENTATION

### INFRASTRUCTURE TYPE SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### IT INFRASTRUCTURE SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### ELECTRICAL CONSTRUCTION SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### MECHANICAL INFRASTRUCTURE SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### COOLING SYSTEMS SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### COOLING TECHNIQUE SEGMENTATION
- Market Overview
- Market Size & Forecast by Revenue | 2017-2023

### TIER STANDARDS SEGMENTATION
- Data Center Tier Cost Analysis
- Market Size & Forecast by Revenue | 2017-2023

### GEOGRAPHICAL SEGMENTATION
- Market Size & Forecast by Revenue | 2017-2023
- Key Countries Market Size & Forecast by Revenue | 2017-2023
- Key Countries Market Size & Forecast by Area | 2017-2023
- Key Countries Market Size & Forecast by Power | 2017-2023

## Data Center Market - Dynamics

The adoption of hyper converged infrastructure will have a higher impact on the growth of global data center market because it enables operating software defined datacenter (SDDC) environments. Most of the vendors in the market are involved in innovating its hyper converged infrastructure (rack scale system) offerings that include necessary hardware and software to process workloads with added simplicity, flexibility, scalability and affordability. Several enterprises are focusing on the adoption of **colocation** spaces comprising 1-10 rack systems, will prefer to procurement of converged or hyper converged systems. However, it is dependent on the cost of these systems and the operational needs. The use of these systems can reduce the IT administrative tasks considerably. Predominant use case of hyper converged infrastructure is virtual desktop infrastructure (VDI) solutions. However, the use of these platforms for other workloads, especially in a hybrid cloud environment is growing rapidly. Increase deployment of cloud workloads such as artificial intelligence

(AI), IoT, and big data will aid the growth of converged and hyper converged infrastructure in the global data center market during the forecast period.

**Data Center Market - Segmentation**

This market research report includes a detailed segmentation of the market by electrical infrastructure, mechanical infrastructure, IT infrastructure, tier standard, general construction, and geography.



## Data Center Market – By Electrical Infrastructure

*Increase in deployment of fuel cells might have a major negative impact on the* global data center market

The global data center market by electrical infrastructure is divided into UPS systems, generators, transfer switches & switchgear, rack PDU, and other electrical infrastructure. UPS systems dominated the market size in 2017, growing at a CAGR of more than 6% during the forecast period. The leading infrastructure providers are procuring **modular rack level UPS systems** that can support only that infrastructure with a capacity of up to 40 kW in the global data center market. Moreover, the implementation of **UPS systems per data hall** with capacity of around 2-3MW per hall to provide redundant backup power during an outage will attribute to the growth of this segment in the global data center market. The top operators are investing in the development of innovative UPS systems to reduce **power** wastage during conversion, improve their efficiency, and lower the OPEX through lesser maintenance cost. The cost of procuring lithium-ion UPS systems will continue to decline during the forecast period, growing the market for facilities UPS systems in the global data center market.

## Data Center Market – By IT Infrastructure

*Demand for mission-critical servers, all-flash arrays, hybrid storage arrays, 25/50GbE Ethernet switch ports will grow in the global data center market during forecast period*

The IT infrastructure segment in the global data center market is classified into server, storage, and network.

The server infrastructure occupied majority of the market share in 2017, growing at a CAGR of around 2% during the forecast period. The top operators are focusing on adoption of **server infrastructure** that best suit their workload needs. The selection of server infrastructure primary depends on factors such as form factors, energy consumption, and virtualization technologies in the global market. In the server segment the processor based on **x86 architecture** dominates the data center market with around 85% of the share. The vendors are offering servers suitable for cloud infrastructure comprising multicore processors, and high capacity memory to grow it the adoption rate in the global data center market. The companies also prefer severs that can enable them to reduce space in the facilities environment meanwhile providing higher performance. The adoption of server infrastructure based on **open community project (OCP) designs** will attribute to the growth of IT infrastructure in the global **data center** market. *This research report also includes market size analysis on hard disk drives (HDD), solid state drives (SSD), all flash array systems, hybrid array systems, and shipment of server and network switches (1/10/25/40/50/100 GbE).*

## Data Center Market – By Mechanical Infrastructure

*Free cooling technique will grow in the US and European Continent, where APAC region will be dominated by water-based cooling techniques in the global data center market*

The global data center market by mechanical infrastructure is segmented into cooling systems, **rack**, and other infrastructure. Cooling systems segment to dominate the market share in 2017, growing at a CAGR of over 5% during the forecast period. The use of **indirect evaporative cooler** and air or **water-side economizers** across countries with colder climatic conditions will propel the growth of this segment in the global data center market. The integration of **2N redundant cooling systems** across **Tier III facilities** will revolutionize the global market. The leading vendors are offering Energy Star certified systems with in-built redundant cooling capacity to attract customers in the market. The operational metrics such as power usage effectiveness (**PUE**), water-usage effectiveness (**WUE**), and carbon usage effectiveness (**CUE**) are gaining immense importance in the global data center market.

## Data Center Market – By General Construction

*Design of sustainable facilities environment with PUE of less than 1.3 coupled with integration of AI and remote monitoring to grow in the global data center market*

The general construction segment in the global data center market is categorized into building development, installation and commissioning services, building design, physical security, and DCIM. Physical security segment occupied a considerable market share in 2017, growing at a CAGR of over 9% during the forecast period. The installation of **security systems** that comprise of **sensors** that are integrated with the existing **DCIM solutions** for real-time remote monitoring benefits will propel the growth of this segment in the global market. The facilities operators are opting for analytics of video surveillance recording and protecting **facilities** from EMP and lightning during natural disasters in the global market. The integration of **robot monitoring systems** with sensor and **video surveillance** in various facilities across the world will propel the growth of the global data center market.

## Data Center Market – By Tier Standards

*The construction of Tier III facilities dominates the market and flexible design pattern are being followed to add more redundancy on support infrastructures in the global data center market*

The global data center market by tier standards is segmented into Tier I & II, Tier III, and Tier IV. Tier III standard facilities dominated the market share in 2017, growing at a CAGR of more than 5% during the forecast period. Most of the new facilities deployment in the market are of **Tier III standards** with a minimum of **N+1 redundancy**. The operators are also offering facilities that can be reconfigured with up to 2N+1 redundancy as the demand arises to sustain the competition in the global data center market. The investment in Tier III facilities is about $780 per square feet, where the construction cost varies based on the facility location. This entirely depends on the redundancy adopted by infrastructure, with a minimum of N+1. The construction of **Tier IV** facilities is expected to experience significant growth in the global data center market during the forecast period.

## Data Center Market – By Geography

*Latin America and MEA will experience higher compound annual growth rate in the global data center market during forecast period*

The geographical segmentation in the global data center market is classified into North America, Europe, APAC, Latin America, and MEA. Americas occupied the largest market share in 2017, growing at a CAGR of over 2% during the forecast period. The billion dollar investments by **colocation providers**, hyperscale operators, enterprises, and government agencies is propelling the growth of the Americas in the global data center market. The US dominates the market when it comes to adoption of innovative infrastructure solutions such as all-flash arrays, hybrid arrays and hyperconverged infrastructure solutions. The increasing interest to procure renewable energy sources and low power cost sources will encourage operators to invest in the development of the data center market in Americas. The adoption of 2N redundancy configuration will grow among **UPS systems** and **PDUs**, while generators and **cooling systems** are still adopting N+1 or N+N configurations in the Americas. Innovations in power sources such as lithium-ion UPS systems, DRUPS, and fuel cells will propel the development of this region in the global data center market.

**Key Countries Profiled**

- US
- Canada
- Western Europe
- Nordic Region
- Eastern Europe
- China & Hong Kong
- Australia
- Singapore

## Key Vendor Analysis

The global data center market comprises of various vendors who control the level of competition. The market

comprises of multiple participants in the vendor space. The vendors in this report is categorized in to three participants namely,

- **Datacenter Critical (IT) Infrastructure Providers:** It include companies that sell IT infrastructure such as server, storage and network products.
- **Datacenter Support Infrastructure Providers:** It includes vendor involved in providing power, cooling, rack, security, and infrastructure management products.
- Data Center Construction **Contractors:** It include general contractors, and sub-contractors involved in design, project management, installation and commissioning services of facilities infrastructure

Multiple innovations are carried out by vendors operating in each space. IT infrastructure vendors are focusing on providing solutions that best suits business operational environments. Power players are focusing on efficiency, cooling players focusing on reducing power consumption, and architectural firms are incorporating innovative design to gain larger global data center market share over the next few years.

## The major vendors in the global data center market are:

- **By IT Infrastructure Providers**
  - HPE
  - Cisco
  - Dell Technologies
  - IBM
  - Huawei

- **By Support Infrastructure Providers**
  - ABB
  - Eaton
  - Rittal
  - Schneider Electric
  - STULZ
  - Vertiv
  - Caterpillar
  - Cummins

- **By Facilities Operators**
  - AECOM
  - DPR Construction
  - HDR Architecture
  - Holder Construction
  - Jacobs Engineering Group
  - Mercury Engineering
  - M+W Group

**Other prominent vendors** include Arista, Atos, Broadcom, Extreme Network, Hitachi Vantara, Inspur Group, Inventec, Juniper, Lenovo, NEC, NetApp, Oracle, Pure Storage, Quanta Computer, Super Micro

Computer, Wistron,  Airedale Air Conditioning, Alfa Laval, Altima Technologies (NetZoom), Bosch Security Systems (Robert Bosch), Condair Group, Delta Group, GE, Legrand, Nlyte Software, Mitsubishi Electric Corporation, MTU On Site Energy, Socomec Group, Trane (Ingersoll Rand), Arup Group, Cap Ingelec, Corgan, CSF Group, Fluor Corporation, Fortis Construction, Gensler, Gilbane Building Co., Jones Engineering Group, KKR Investment Group, Morrison Hershfield, Mortenson Construction, Structure Tone, Syska Hennessy Group, and Whiting-Turner Contracting

**Key market insights include**

1. The analysis of global data center market provides market size and growth rate for the forecast period 2018-2023.
2. It offers comprehensive insights on current industry trends, trend forecast, and growth drivers about the global data center market.
3. The report provides the latest analysis of market share, growth drivers, challenges, and investment opportunities.
4. It offers a complete overview of market segments and the regional outlook of global data center market.
5. The report offers a detailed overview of the vendor landscape, competitive analysis, and key market strategies to gain competitive advantage.

## OUR PROCESS


Identification of Data


Market Dynamics


Collection of Data


Collaboration of Data


Verification and Analysis

# Best **Trending Reports** in the Market

Our focus is to incorporate advanced data derivation techniques and methodologies in market research reports. It is our endeavor to keep abreast of advanced technological developments and emerging trends to stay relevant. It helps us to maintain and improve our products and serve our customers better.

 Apr-2019

Data Center Rack Market in Europe - Industry Outlook and Forecast 2019-2024

*Number Of Pages: 236*

Apr-2019

Fire Sprinkler System Market - Global Outlook and Forecast 2019-2024

*Number Of Pages: 221*

Apr-2019

Telehealth Market - Global Outlook and Forecast 2019-2024

*Number Of Pages: 230*

Apr-2019

Earphones and Headphones Market in US - Industry Outlook and Forecast 2019-2024

*Number Of Pages: 219*

Apr-2019

Data Center Construction Market in Europe - Industry Outlook and Forecast 2019-2024

*Number Of Pages: 295*

Mar-2019

Global Electric Lawn Mower Market – Comprehensive Study and Strategic Analysis 2019−2024

*Number Of Pages: 387*

THE COMPANY

About Us

Contact

Careers

FAQ

Testmonials

OUR SERVICES

Advisory & Custom Research

Competitive Intelligence Insights

Syndicated Research

MEDIA

Press Releases

Blogs

SIGN UP TO OUR NEWSLETTER

E-mail (Corporate Only)*    Subscribe

I accept the Terms and Conditions

Sitemap

Privacy Policies

Terms of Service

Powered by AXLR Data

# EXHIBIT K



Industry Expertise    Consulting Services    Our Publications    Insights    About Us    Careers

Home / Reports / Information and Communications Technology / Data Centre Market

## Data Centre Market Research Report - Global Forecast to 2023

ID: MRFR/ICT/3299-HCRR| January, 2019 | Region: Global | 100 pages | Half-Cooked Research Reports

| Description | Table of Content | Free Sample |
|---|---|---|

**Buy Now**

Global Data Center Market, By Type (Corporate data centers, Web hosting data centers), Density (Low, Medium, High, Extreme), and Verticals (Banking & Financial Services, Telecom & IT, Government, Healthcare) – Forecast to 2023

Market Synopsis of Data Centre Market:

Market Scenario:

Data Centers refers to virtual or physical infrastructures that are used by enterprises to store a large amount of mission-critical data. The data centers assist in storage, retrieval, and processing of this data. These data centers require multiple backs up supply units, networking connections, and cooling systems for running the enterprise's core applications. The data centers include a number of elements such as electrical switches, power distribution units, uninterruptible power supplies, ventilation, and provisions for network connectivity. Modern data centers make use of management and monitoring software that allows the IT administrators to oversee the equipment and monitor the facilities remotely.

Technology giants such as Digital Realty Trust, Inc.    IBM Corporation, Hitachi Ltd., Cisco System, Inc., Hewlett-Packard Inc.,  EMC Corporation, and CyrusOne  are some of the major players in the global data center market.   Digital Realty Trust, Inc. is one of the leading vendors of the data center market. It owns a range of data center solutions such as Electrical and Cooling systems, data center cages, and suites. The company focuses on building customized data centers, cages, and suites based on client needs. Whereas, IBM Corporation focuses on data center outsourcing, middleware services, storage services, and networking services. Hitachi Ltd., Cisco System, Inc.,

### Purchase this Market Research Report

| USD | GBP | € EURO | ¥ YEN | INR |
|---|---|---|---|---|

Single User Electronic (PDF) — **4450.0** ⊙

Enterprise Electronic (PDF) — **6250.0**

**Buy Now**

Sample
Question
Discount
Order
Info
Refer

### Press Release

**Global Data Center Market Is Estimated To Grow At A Cagr Of 11% During The Forecast Period 2017 2023**

You may also be Interested in..

Hewlett-Packard Inc. focus on building optimized operation for data center infrastructures.

Increasing demand for data storage management and cloud technology are major factors driving the growth of the global data center market. However, high initial cost of investment may hinder the market growth over the review period. The gaining popularity of the community cloud technology is expected to create lucrative opportunities for the market.

The global data center market has been segmented on the basis of    type, density, and vertical. The type segment is classified into corporate data centers and web hosting data centers. The corporate data center segment is expected to hold the major share of the market owing to the increasing demand for data storage management by large enterprises.

The North American region holds the largest share of the global market followed by Europe, and Asia Pacific regions. The U.S. and Canada are dominating the North American market due to rising technological enhancements and increasing popularity community cloud in the region. The region also has a well-established infrastructure, which allows faster implementation of advanced technologies. Additionally, rising investment in the data centers in the U.S. is another major factor driving the growth of data center market in the region.

The global data center  market is expected to grow at a CAGR of approximately 11% during the forecast period 2017-2023.

Global Data Center Market






Enterprise Metadata Management Market Research Report Forecast To 2023


Event Management Software Market Research Report Global Forecast To 2022


Industrial Vision Market Research Report Global Forecast 2023

Integration Platform As A Service (I Paa S) Market Research Report Forecast Till 2023

Key Players:

Some of the prominent players in the global data center market: Digital Realty Trust, Inc. (U.S), IBM Corporation (U.S), Hitachi Ltd (Japan), Cisco System, Inc. (U.S), Hewlett-Packard Inc. (U.S), EMC Corporation(U.S), CyrusOne (U.S), Global Switch (U.K), DuPont Fabros Technology(U.S) and Telehouse (U.K).

Segments:

The global data center market is segmented by type, density, and vertical. Based on the type, the market is segmented into corporate data centers and web hosting data centers. Based on the density, the market is segmented into low, medium, high, and extreme. The vertical segment includes banking & financial services, telecom and IT, government, healthcare, and others.

Regional Analysis:

The global data center market is studied in Asia Pacific, North America, Europe, and Rest of the World. North America is estimated to account for the largest share of the market, whereas Asia Pacific is projected to grow at the fastest rate during the forecast period. The North American market growth is attributed to rising investments in data centers and gaining importance of community cloud systems.

Intended Audience

- Technology Investors

- Research/Consultancy firms

- Technology Solution Providers

- Government Bodies

- Retailers

Industry Expertise
Consulting Services
Articles  About Us  Careers
Contact Us

Sitemap  Terms and
conditions  Privacy Policy

CONNECT WITH US

https://www.marketresearchfuture.com/reports/data-centre-market-4721[4/12/2019 11:41:24 AM]

Secured by **PayPal**

© 2018 Market Research Future®(Part of WantStats Research And Media Pvt. Ltd.)

# EXHIBIT L

Welcome : Guest

☐ Register   ☐ Login   ☐ Shopping Cart



# Global Industry Analysts, Inc.
A Worldwide Business Strategy & Market Intelligence Source



| Home | About | Methodology | Clients | Newsletter | Insider | Search | Blog |

## Myriad Benefits of ==Cloud Computing== Bring Out ==the Significance of Internet Datacenters== in an Era Where Agility, On-Demand Scalability & Low Costs are Linchpins for Business Success

*Published: October 2018*

Report Overview and Infographic

| Code: | Pages: | Tables: | Companies: | Price: | 2065 Influencers from |
|---|---|---|---|---|---|
| **MCP-6793** | **329** | **80** | **87** | **5600** | **25** Companies |

| REPORT INDEX | BLOG |
|---|---|

| FREE SAMPLE | QUESTIONNAIRE ☐ |
|---|---|

## Internet Data Centers

The global market for Internet Data Centers (IDCs) is projected to reach US$89.5 billion by 2022, driven by the many benefits of cloud computing including infinite low cost storage against the backdrop of exponential increase in data generation. With growing emphasis on cost reduction, the benefits of shared infrastructures are emerging into the spotlight, thereby driving popularity of third party, outsourced IDCs. The continuous evolution of IT, development of cloud computing technology and increasing role of mobility in enterprise operations are fueling investments in IDCs. The market is also being positively impacted by the focus on green IT against the backdrop of companies seeking to attain the benefits of business energy efficiency, sustainability and green accreditations. Benefits of IDCs include flexibility in servers, storage and networking deployment and management; on-demand resource scalability; stability and security; greater redundancy than on-premise counterparts; more efficient disaster recovery and business continuity; easy and cost-effective migration path; and uninterrupted connectivity to the datacenter, among others. Other major factors also expected to influence market growth include development of cloud computing technology which represents the foundation for the evolution of IDCs; explosion of big data, rapid proliferation of Internet of Things (IoT) and the ensuing data overload, increased datacenter capacity needs and increased investments in IDCs; heterogeneous IT environments and rising adoption of hybrid clouds; rise of enterprise mobility, increased deployment of bring your own device (BYOD) programs and the ensuing demand for anytime, anywhere access to corporate data which can be fulfilled only by an agile always-on IDC hosted on a cloud. The United States represents the largest market worldwide. Asia-Pacific is poised to record the fastest CAGR of 20.6% over the analysis period, led by the development of the enterprise sector; growing cloud readiness of Asian economies; increased reliance of emerging Asian economies on digitalization, the Internet and transformative enterprise technologies; exploding Internet data traffic, rapid expansion of cloud-based services and increased adoption of Internet of Things (IoT) in several countries across the region.

## Company and Industry News & Stories

- Amazon Web Services to Open AWS Africa (Cape Town) Region, a New Infrastructure Region in South Africa in H1 2020

- CyrusOne to Build Additional Data Centres in Frankfurt and London to Boost its European Presence and Global Footprint

- Silent Partner Group to Build Six Data Centres in Finland and Norway with an Aim to Decrease Carbon Footprint in these Countries

- Google to Expand Eemshaven Data Center with an Investment of €500 Million

- EdgeCore Internet to Build New Data Center Campus in Northern Virginias with Acquisition of 36.8 Acres of Land in Sterling

## Product Definition & Scope

○ "Internet Data Centers" (IDCs) are defined as datacenters connected to and accessed through the Internet. An IDC is commonly referred to as an outsourced solution and unlike data centers specifically built for a single large company, these datacenters are third party data centers hosted on behalf of companies and are designed to house all data-storage functions of clients and/or house all servers and related internet equipment. And unlike conventional third party hosted data center, wherein private connectivity is provided for companies to access the data center, IDCs utilize the internet as the only connectivity highway for clients to access the data center.

## Timeline for Analysis

○ Market Estimates and Forecasts for 2015-2022

○ Historic Review 2009-2014

## Geographic Markets Analyzed

○ US, Canada, Japan, Europe (France, Germany, Italy, UK, Spain, Russia and Rest of Europe), Asia-Pacific (China, India, and Rest of Asia-Pacific), Latin America (Brazil and Rest of Latin America), and Rest of World

## Major Players

○ 21Vianet Group, Inc.

○ AT&T, Inc.

○ Cogent Communications, Inc.

○ Cyxtera Technologies

○ DXC Technology Co.

○ Equinix, Inc.

○ Google, Inc.

○ IBM Corporation

## How Can You Benefit?

This research project broadly covers analysis of all market trends, drivers, challenges and other macro market scenarios you need to know to improve your strategic planning and remain informed and competitive. The study also provides reliable ready facts and exclusive statistical data insights in addition to expert and highly accurate market size forecasts and projections to help you identify new markets and opportunities for revenue growth and sustainability. The extensive reportage of industry, company and product news and stories together with coverage of all major and niche

Interested in our research, you can contact our 24/7 Research Support e-Desk at rsd@strategyr.com

players provided in the report helps you build a 360 degree perspective on your markets and gain unsurpassed insights needed to devise plans and strategies to maximize business growth.

## Infographic Gallery

1. http://www.studyweb.com/outrageous-costs-data-center-downtime/

2. http://wiredre.com/global-data-center-market-growing/

3. http://siliconangle.com/blog/2013/09/12/netapp-infographic-chronicles-birth-of-software-defined-data-centers/

4. http://anthesisgroup.com/latest-research-by-anthesis-americas-data-centers-consuming-massive-and-growing-amounts-of-electricity/

5. https://in.pinterest.com/pin/389561436495134624/

Disclaimer    Privacy policy    Contact Us    Feedback    Careers

© Global Industry Analysts, Inc., USA. All Rights Reserved.

# EXHIBIT M



Mordor Intelligence

Store ⌄   Solutions ⌄   About   Contact   📞+1 617-765-2493   USD ($) ⌄   🔍

GLOBAL MEGA DATA CENTER MARKET
APR 2018

**Mega Data Center Market - Segmented by Solution (Storage, Networking, Servers, Security), End-user, and Region - Growth, Trends, and Forecast (2019 - 2024)**

🔻 Download Free Sample NOW   ✎ Customize The Report

**PURCHASE REPORT**

● $ 4250   SINGLE USER LICENSE
○ $ 4500   TEAM LICENSE
○ $ 8750   CORPORATE LICENSE

🛒 Buy Now - $ 4250

👁 Buy Sections of Report

Our Clients Include        View All

‹   BASF   ›

| DESCRIPTION | TABLE OF CONTENTS |
|---|---|

Mega data center market was worth USD 18.82 billion in 2017 and is projected to grow to USD 24.25 billion by 2023 at a CAGR of 4.32% during the period 2018 - 2023. The report discusses the various types of solutions provided by mega data centers. ==While the regions considered in the scope of the report include North America, Europe, and various others. The study also emphasizes on how growing demand for colocation services is affecting the market.==

Server workloads continue to grow with each passing year, which has shown an adverse effect on IT operations. It is estimated that there is an increase of 35% data growth rate per year, and this has resulted in many organizations double their on-premises storage over a three-year period, leading to over-builds that drive to wasted capital across infrastructure, power, and staffing costs. Increasing digitization globally is expected to contribute value to different end-user industries, such as BFSI, IT services, which is rising need for mega data centers worldwide. Various governmental bodies have been identified to facilitate Industry 4.0 by deploying IoT and cloud services, which is further expected to drive the mega data center market.

**Rising Demand for Data Center Colocation to Drive the Market**

Colocation acts as an attractive solution as it allows organizations to solve a problem without substantial upfront costs, which is one of the reasons expected to drive the growth of this market. Data center colocation is expected to see significant growth the forecast period owing to the benefits provided by these data center over conventional ones. Colocation center has been identified to provide more significant scalability, which acts as a perfect solution for small companies that are looking to expand, as well as firms that are aiming to increase their market share. In addition to that, colocation data centers also offer enhanced flexibility, like data analytics and improved data security making it a very viable alternative for in-house data centers.

**Rising Demand from BFSI Sector to Augment the Growth**

Banking and finance sector is one of the largest generators of data, and the need for a data center to regulate the cost of operations is a primary driver. Finance and banking structures use data centers to store the customer records, employee management, transactions, electronic banking services, such as remote banking, telebanking, self-inquiry, which need data centers for their functioning. Data centers are believed to be an infrastructure that is the future of finance. Many institutions have created private cloud system to accommodate massive network, storage, and server capacities to support their retail financial centers, ATMs, and active online accounts.

Many banks maintain their own data centers, but the trend is found to be changing owing to the fluctuations in the profits for the banks. Also, maintaining a data center is a cumbersome process owing to the cost drain on the IT, real estate and operations as any data center requires proper cooling, security and power facilities. This can act as a challenge for the BFSI industry during the forecast period.

**Growing Demand from Asia-Pacific to Drive the Market**

The growing demand for high-density, redundant facilities throughout China is precipitating a shift in the design and development of the country's data centers. China has 50 internet users per 100 population indicating scope for lot of development and the connectivity ecosystem is made up of 73 colocation data centers, 52 cloud service providers and 0 network fabrics. However, power, space and IP transit all cost more in China emphasizing the difficulties in maintaining a data center. Similarly, in India, 9.5% of the GDP is contributed by the digital economy, the digital economy includes USD 25,518 million fixed line telephone subscriptions and 1011.054 million mobile telephone subscriptions, indicating a lot of scope for development of data centers. Moreover, owing to regulatory and security reasons, a number of organizations in India, especially from the BFSI sector, are not allowed to host their data in a data center that is out of the country. As a result, the data center providers are setting up local data centers in India indicating the growing mega data center facilities in India.



**Number of Hyperscale Data Centers: in units, Global, 2015 - 2019**

| 2015 | 2016 | 2017 | 2018* | 2019* |
|---|---|---|---|---|
| 259 | 338 | 386 | 448 | 509 |

Source: Cisco        Mordor Intelligence

**Looking to Customize Report?**

Your Email

I am looking specifically for . . .

Request for Custom Report

I am looking specifically for . . .

I am looking specifically for . . .

Your Email

I am looking specifically for . . .

Your Email

I am looking specifically for . . .

Request for Custom Report

Your Email

I am looking specifically for . . .

Your Email

I am looking specifically for . . .

Request for Custom Report

Your Email

I am looking specifically for . . .



**Key Developments in the Market**

- December 2017 - Iron Mountain Inc. completed the acquisition of the U.S. operations of Phoenix-based IO Data Centers LLC. It bought IO for USD 1.34 billion. The acquisition includes up to an additional USD 60 million based on future performance
- October 2017 - QTS Realty Trust, an international provider of data centers, managed to host and cloud services announced it had commenced development of a mega data centre campus in Ashburn, Virginia

The major players include - Cisco Systems Inc, Dell, Fujitsu, Hewlett-Packard, IBM Corporation, IBM Corporation, Intel Corporation, Juniper Networks, Inc., and Verizon, among others.

**Reasons to Purchase this Report**

- Analyzing the growing demand for data center consolidation and its effect on the market
- Analyzing various perspectives of the market with the help of Porter's five forces analysis
- The solution and end-user that are expected to dominate the market
- The region that is expected to witness fastest growth during the forecast period
- Identifying the latest developments, market shares, and strategies employed by the major market players
- 3-month analyst support, along with the Market Estimate sheet (in excel)

**Customization of the Report**

- This report can be customized to meet your requirements. Please connect with our representative, who will ensure you get a report that suits your needs



**⬇ Download Free Sample Report**



**QUICK LINKS**

HOME                INDUSTRY REPORTS

CONSULTING          BLOG

CONTACT US          PRESS RELEASE

PRIVACY POLICY      TERMS AND CONDITIONS

SITE MAP

**JOIN US**

We are always looking to hire talented individuals with equal and extraordinary proportions of industry expertise, problem solving ability and inclination.
Interested? Please e-mail us
careers@mordorintelligence.com

**CONTACT US**

⦿ 5th Floor, Brigade Towers, Financial District,    Gachibowli, Hyderabad - 500 032

✆ +1 617 765 2493

✉ info@mordorintelligence.com

# EXHIBIT N



# VERTIV COLOCATION
# DATA CENTER USAGE REPORT

Understanding Buyer Behaviors
for Colocation Services

## Section 1: Methodology

Vertiv recently conducted an online survey of 226 U.S. enterprise data center managers regarding their use of colocation services – current and planned. For this survey, the term "colocation" includes multi-tenant data centers, off-premise computing, managed hosting and cloud hosting data centers.

Respondent industries included financial services, education, manufacturing, healthcare, government, professional service and telecommunications. Organizations ranged in size from more than $1 billion to under $10 million.

The intent of the survey was to gain understanding of:

- How colocation services are currently used
- Future plans for using services
- Challenges in adopting colocation services
- Likes and dislikes about services

Sixty-five percent of respondents said that their organizations are using colocation data centers or will use them within the next 12 months. Among current users, most are recent adopters, with 64 percent indicating that have used colos five years or less. These numbers reflect the experiences of both large and small companies.

**Are You Using Colocation?**



- Yes
- No, but we plan to in the next 12 months
- No, and we have no intention to use them

**How Long Have You Used Colocation?**



- Less than 1 year
- 1-5 years
- 6-10 years
- More than 10 years

**How Long Have You Used Colocation? (by size of company)**



- Revs < $1B
- Revs > $1B

2



## Section II: Key Findings

### 1. Colocation providers must prepare to meet new demand.

Fifty-seven percent indicate that they will increase colocation usage within the next 24 months. New enterprise data center construction has stalled in the last two years, with most capacity expansion in the time being achieved without physical expansion, through colocation or cloud services. In the next 24 months, these trends will continue, as new enterprise data construction continues to dwindle.

**How Will Your Use of Colocation Services Change in the Next 2 Years?**



- ■ Increase
- ■ Stay the Same
- ■ Decrease
- ■ Don't know

**How Enterprises Have Expanded Data Center Capacity In The Last Two Years**



**How Enterprises Will Expand Data Center Capacity In The Next 2 Years**



## 2. Colocation providers must go up the value chain, offering diverse services to support growth.

IT capacity is being deployed in many ways, with deployments becoming increasingly diverse and complex. Colocation providers must build and scale to support a variety of deployments.

Most enterprises now use a variety of data centers, with 47 percent using more than one type. Fifty-two percent include colocation in their mix of data centers, either exclusively or in combination with other types. Thirty-two percent of respondents are hybrid data center users, i.e. they use enterprise data centers and others. Smaller respondents indicated that they have fewer owned data centers.

Most of the smaller respondents are retail colocation service customers, with less than 250kW in power provisioned. Approximately two-thirds of all respondents indicated that they do not yet have most of their IT power in colos.

How colocation data centers are being used is also diverse. More than 40 percent of respondents indicated that they are using colocation facilities to back up their primary data centers. More than one-third indicated that colocation data centers are their primary data centers for compute and critical infrastructure and nearly as many are using colocation for cloud services. Nearly a third of respondents are using colocation for cloud services, a growing opportunity for providers to meet customer needs and differentiate their services. Smaller enterprise companies reported being more reliant on colocation than large companies for backup, primary compute and cloud services.

### What Types of Data Centers Are You Currently Using?



### What Types of Data Centers Are You Currently Using? (by company size)





## 3. Pricing models are complex and based on a multitude of factors, and colocation providers must be able to demonstrate price transparency.

Colocation users cited 22 different combinations of services used in pricing colocation contracts. The top four services included number of racks, managed services, metered electricity and floor space. Pricing is the biggest complaint of colocation customers (see #10 below), and providers can demonstrate higher value if they provide transparency in how they structure their SLAs around power and capacity usage and how they monitor and meter usage.

### How Are You Charged for Colocation Services?



## 4. Colocation Providers Need To Be Able to Quickly Support Customer Scalability

The need to improve capacity scalability is the number one reason customers move to colocation. Other top reasons include edge connectivity, inability for internal staff alone to support data center expansion, insufficient budgets for enterprise data center expansion, and the need to support new business initiatives with faster time to market.

In the case of colocation companies building new data centers, scalability can be achieved by providing capacity in increments, which reduces capital expense. Scalable deployments can increase utilization rates to ensure that capacity that might become stranded is available for sale to customers. Where white space is limited, colocation providers have increased density to achieve higher capacity, using technologies such as containment and different types of power configurations.

### What Are The Primary Reasons You Have Moved or You Will Move to Colocation?



## 5. Colocation providers must continue providing support for customers migrating critical applications.

Most enterprises have moved storage management, email, database services and web servers to colocation. Over the next 12 months, applications not yet in colocation that will be moved include storage management, file/print servers, development, IT service management and human resources.

### Which Applications Have You Already Moved To Colocation?



| Application | Percent |
|---|---|
| Store Management | 74% |
| Email | 66% |
| Database Services | 59% |
| Web Servers | 54% |
| Communications/Collaboration | 48% |
| Networking Tools | 47% |
| Development | 41% |
| Customer Hosting | 41% |
| High Performance Computing | 36% |
| Financial/Accounting | 35% |

### Over The Next 24 Months, Which Applications Will You Move To Colocation That Are Not In Colocation Today?



| Application | Percent |
|---|---|
| Store Management | 10% |
| File/Print Server | 10% |
| Other | 9% |
| Development | 8% |
| IT Service Management | 8% |
| Human Resources | 8% |
| Communications/Colaboration | 8% |
| Networking Tools | 8% |
| Data Analytics | 8% |
| Web servers | 7% |
| Intranet | 7% |

## 6. Cost, Security, Internal Staffing Limit Colocation Adoption

The move to colocation services is rife with complexity for managers outsourcing applications to off-site locations. It often requires new change management procedures, redeployment of IT personnel and changes in security processes and compliance.

Forty-five percent of respondents cited cost among their top three challenges in moving more applications to colocation. Thirty-one cited security concerns and 18 percent cited internal staffing-constraints. Smaller companies were constrained more by staffing, while larger companies were constrained more by the challenges of migrating cloud services and meeting compliance requirements.

### What Are The Top 3 Challenges That Keep You From Moving More Applications To Colocation?



| Challenge | Percent |
|---|---|
| Cost | 45% |
| Security | 31% |
| Internal Staffing | 18% |
| Compliance | 14% |
| Migration or Cloud Systems | 13% |
| No Challenges | 12% |
| Change Management | 12% |
| Incompatible Architectures | 11% |
| Location | 10% |

### Top Challenges To Using More Colocation

Sampling of Comments

- "Cost, Change management, Incompatible architectures."

- "Change management, migration of cloud systems, internal staffing."

- "Cost, location, siloed processes."

- "Security, change management, development of automated application management."

- "Internal staffing."



**7. Colocation providers wanting to pursue larger customers must support more demanding requirements – and still compete on price.**

Price and security are the top selection criteria for potential customers evaluating colocation providers, with the two criteria nearly of equal importance. Larger companies have more factors of importance than smaller companies, with seven factors selected in the top five by more than 30% of respondents. For smaller companies, power reliability and capacity scalability round out their top criteria.

**What Are The Top Factors You Use In Selecting Your Colocation Provider?**



7

**8. Colocation has important benefits, but providers must mitigate the culture shock for IT managers of outsourcing operations.**

As most customers of colocation are small companies and relatively new at outsourcing their IT operations, they like the improved security and reliability offered by colocation providers, and the fact they no longer have to maintain infrastructure. However, outsourcing IT is a culture shock to them, and many expressed concerns about access, distance to their facility and a sense of loss of control over their IT operations.

| Which Aspect Of Your Colocation Data Center Or Service Do You Like The Least? | Which Aspect Of Your Colocation Data Center Or Service Do You Like The Most? |
|---|---|
| A Sampling Of Comments | A Sampling Of Comments |
| • "Being at the mercy of an outside company to respond promptly to our needs." | • "Backup, control and maintenance handled for us, Large amounts of data sound and secure." |
| • "Having to drive out there to make physical changes." | • "Ability to flex capacity with speed and no major cost outlay." |
| • "Lack of operational control." | • "The abstraction from specific deployment types, and the ability to take advantage of the constant industry improvements in the world of container and virtual management." |
| • "Recurring costs of seemingly one-time installations such as cross connects.  Also older colo facilities that cannot bill actual power usage." | |
| • "Slow response for smart-hands assistance." | • "Reliability and centralized access to cloud networks." |
| • "1000 miles away makes it harder to manage. Too far away." | • "Traveling to the colocation site in Frankfurt." |

**9. Customer expectations generally are being met.**

More than 70 percent indicated that their expectations were currently met by colo usage, with respondents saying top advantages include disaster recovery improvement; lower, more predictable costs; better security; easier scalability; improved backup and staffing expertise listed as the top advantages. Larger companies were less satisfied than smaller companies.

**Were Your Expectations Met For Using A Colocation Data Center?**



- Yes
- No
- Somewhat

**Were Your Expectations Met For Using A Colocation Data Center? (by company size)**



- Revs < $1B
- Revs > $1B

8



## 10. Customers aren't afraid to change providers.

Most colocation users indicate that they have not changed providers, but they are not afraid to change. Having used colocation services longer, larger enterprises are more likely to have switched providers than smaller companies. Pricing, cost and inability to meet capacity needs were mentioned as the key reasons for making changes. Thirty-six listed cost or pricing as the key driver for changing providers.

### Have You Ever Switched Colocation Providers?



### Have You Ever Switched Colocation Providers (by company size)



### Why They Changed Providers

Sampling of Comments

- "Issues with support and pricing. Being charged a lot for small requests."

- "Pricing model and capacity availability."

- "SLA not met."

- "Better price, newer data center."

- "Merger of colocation provider."

## 11. Colocation providers would benefit by engaging third-party IT consultants as part of their business development programs.

While nearly two-thirds of respondents rely on internal personnel to make recommendations for moving to colocation, nearly one-third use IT consultants when researching potential partners. Within the company itself, IT Managers/Directors and CIOs are primarily involved in the selection and final decision processes. With C-level executives making decisions, colos must focus on making the business case first while providing technical specs second.

### Who Do You Rely On For Evaluating Colocation Or Other Off-Premise Solutions?



## Section III: Conclusion

The Vertiv survey indicates general satisfaction with current colocation services among enterprise end user customers, and validates the trend reported by other sources that the use of colocation will increase in the coming years. Colocation providers enjoy a high
retention rate – three-quarters of users have not changed providers. That is due in part to customer expectations having been met.

However, the early stages of colocation deployment are now over for most companies, and they are looking at future IT application deployments in colocation and the cloud that are more diverse, complex and business critical. Colocation providers will have to differentiate themselves with new services, especially around the cloud, will have to offer a greater number of services to capture larger customers, and will have to demonstrate price transparency to retain customers. Price will likely remain among the top criteria for selecting colocation providers.

This complexity will also likely mean that smaller companies will continue relying on outside IT consultants in selecting colocation providers, and providers would be well served to identify these consultants and nurture relationships with them.

Both colocation providers and their customers continually seek ways to reduce operating costs. While reliability is critical to the colocation business and important to customers, it is also a feature common to the offerings of most colocation providers. Customers are more concerned with whether a given provider can support capacity scalability and meet security requirements as IT operations grow in complexity.

Companies moving to colocation need a higher degree of hand-holding to smooth the process of migrating operations and applications to outsourced data centers. Well-defined SLAs and transparent pricing can help alleviate concerns. Customers expressed satisfaction with providers who offered exemplary support services. Providing highly personalized services can separate smaller colocation providers from the very large cloud hosting companies. Customizing SLAs and adding cloud services are ways to attract and retain new business.

Vertiv believes that innovations in power, cooling and data center management infrastructure can play an important role in keeping colocation provider costs in line, enhancing revenue and profitability and ensuring continued protection of increasingly complex IT applications. Importantly, new infrastructure technologies that reduce operational costs, eliminate stranded power and cooling capacity, reduce the maintenance burden and provide greater insight and control of data center conditions can help colocation providers operate at peak performance. In turn, they can improve customer SLAs and enhance profitability and be more attractive to potential new customers.





**VertivCo.com**  |  **Vertiv Headquarters,** 1050 Dearborn Drive, Columbus, OH, 43085, USA

© 2017 Vertiv Co. All rights reserved. Vertiv and the Vertiv logo are trademarks or registered trademarks of Vertiv Co. All other names and logos referred to are trade names, trademarks or registered trademarks of their respective owners. While every precaution has been taken to ensure accuracy and completeness herein, Vertiv Co. assumes no responsibility, and disclaims all liability, for damages resulting from use of this information or for any errors or omissions. Specifications are subject to change without notice.

SL-24695 (R08-17)

# EXHIBIT O

FILED: 1/14/2019 1:19 PM
David Trantham
Denton County District Clerk
By: Shelbi Malatin, Deputy

CAUSE NO. _____  19-0342-442

| | | |
|---|---|---|
| **CYRUSONE LLC and**<br>**CYRUSONE, INC.,** | § <br> § <br> § | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | § <br> § | |
| **v.** | § | **DENTON COUNTY, TEXAS** |
| | § | |
| **STUART LEVINSKY,** | § <br> § | |
| | § <br> § | |
| **Defendant.** | § | **____ JUDICIAL DISTRICT** |

### PLAINTIFFS' ORIGINAL VERIFIED PETITION AND APPLICATION
### FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

Plaintiffs CyrusOne, Inc. and CyrusOne LLC (collectively, "CyrusOne") file the following

Original Verified Petition and Application for Temporary Restraining Order and Injunctive Relief

against Stuart Levinsky, and for causes of action would respectfully show the Court as follows:

**1.**
### DISCOVERY CONTROL PLAN

1.1.    Plaintiffs intend to conduct discovery under Level 2 pursuant to Texas Rule of Civil

Procedure 190.3, subject to any Court order expediting discovery in this matter.

**2.**
### STATEMENT OF RELIEF SOUGHT

2.1.    Plaintiffs seek monetary relief over $1,000,000.00. Tex. R. Civ. P. 47(c)(5). Such

damages are within the jurisdictional limits of this Court.

**3.**
### PARTIES AND SERVICE

3.1.    Plaintiff CyrusOne, Inc. is a Maryland corporation that is authorized to do business

and has its principal place of business in Texas.

3.2.    Plaintiff CyrusOne LLC is a Delaware limited liability company that is authorized

to do business and has its principal place of business in Texas.

3.3.    Defendant Stuart Levinsky ("Levinsky") is an individual and former employee of CyrusOne. Levinsky is a resident of Seattle, Washington. His home address is 3720 60th Ave. SW, Seattle, WA 98116. Levinsky may be served personally at his home address, or wherever else he may be found.

**4.**
**JURISDICTION AND VENUE**

4.1.    Jurisdiction is proper in this Court pursuant to the relevant portions of the Texas Constitution, the Texas Government Code, other applicable law, and the Employment Agreements (defined below) in which the parties submitted to the exclusive jurisdiction of the state or federal courts located in Denton County, Texas. This Court has jurisdiction over the subject matter of the claims in this lawsuit and the amount in controversy is in excess of the minimum jurisdictional limits of the Court.

4.2.    Venue is proper in Denton County, Texas pursuant to the forum selection clauses contained in the Employment Agreements (defined below).

**5.**
**FACTUAL BACKGROUND**

5.1.    This dispute arises out of former CyrusOne employee Stuart Levinsky's resignation from CyrusOne and his decision to breach the legal duties he owed to CyrusOne by joining a direct competitor, Switch, Inc. ("Switch").

5.2.    CyrusOne is a global data operator, with a  portfolio network of more than 45 data centers in key North American, European, South American and Asian markets designed to meet the needs of many of the world's leading enterprise, technology and cloud computing companies. CyrusOne provides high-quality colocation with robust connectivity and the flexibility businesses need to scale for future growth. To this end, data center and connectivity products and services are intimately linked in that customers in the industry both (a) lease data center capacity and also

(b) purchase connectivity services. Customers also turn to CyrusOne to gain flexible access to additional data-center capacity for their private cloud requirements.

5.3.    Levinsky was hired by CyrusOne on or about September 30, 2012. Before his resignation on or about November 9, 2018, he served as Vice President of Cloud and Global Accounts for CyrusOne. During his tenure at CyrusOne, he served as the general manager of CyrusOne's Phoenix campus and helped develop that into one of the most successful campuses in the Company's portfolio. He was involved in selling to many of the largest companies in the world.  Approximately 90% of the customers in the Phoenix location are headquartered outside of Arizona. Levinsky was successful attracting these customers to the Phoenix campus and was actively competing against many competitors, including Switch. Levinsky deemed Switch to be one of CyrusOne's strongest competitors. Levinsky was one of the most successful sales executive at CyrusOne and was one the most highly compensated employees in the Company. He was chosen in 2017 to lead the company's new strategic cloud initiative based in Seattle, Washington. Given his executive sales leadership position, Levinsky was intimately involved in all aspects of CyrusOne's strategy, customer relationships, pricing information, build costs, and other competitively sensitive information. Levinsky was also involved in CyrusOne's design and construction techniques and supply chain management, all of which provide competitive advantages that CyrusOne enjoys against its competition across the United States.

5.4.    CyrusOne requires certain employees to sign non-disclosure, non-solicitation, and non-competition agreements as part of the Company's efforts to protect its confidential information and goodwill, and to maintain its competitive position.

5.5.    On or about March 25, 2013, Levinsky entered into a Non-Disclosure and Non-Competition Agreement with CyrusOne ("2013 Agreement"). A true and correct copy of that

---

Agreement is attached to this Petition as Exhibit A. In that Agreement, Levinsky acknowledged that, in the course of his employment, he would be entrusted with, have access to, and obtain goodwill belonging to the Company and intimate, detailed, and comprehensive knowledge of confidential, proprietary, and/or trade secret information to which he did not previously have or have access to:

> Employee acknowledges that in the course of employment with the Company, Employee will be entrusted with, have access to and obtain goodwill belonging to the Company and intimate, detailed, and comprehensive knowledge of confidential, proprietary, and/or trade secret information ("Information") that Employee did not have or have access to prior to signing this Agreement, including some or all of the following: (1) information concerning the Company's products and services; (2) information concerning the Company's customers, suppliers and employees; (3) information concerning the Company's advertising and marketing plans; (4) information concerning the Company's strategies, plans, goals, projections, and objectives; (5) information concerning the Company's research and development activities and initiatives; (6) information concerning the strengths and weaknesses of the Company's products or services; (7) information concerning the costs, profit margins, and pricing associated with the Company's products or services; (8) information concerning the Company's sales strategies, including the manner in which it seeks to position its products and services in the market; (9) financial information concerning the Company's business, including budgets and margin information, and (10) other information considered confidential by the Company. Employee may also be entrusted with and have access to Third Party Information. The term "Third Party Information" means confidential or trade secret information that the Company may receive from third parties or information which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for limited purposes.

2013 Agreement, ¶ 2.

5.6.    Levinsky agreed that that information was competitively valuable, to keep that information confidential, to not use or disclose that information to third parties (except to perform his job for CyrusOne), and to return to CyrusOne all company property upon the termination of his employment with CyrusOne:

> 3.    Employee agrees that the Information and goodwill are highly valuable, provide a competitive advantage to the Company and allow Employee a unique competitive opportunity and advantage in developing business relationships with

the Company's current or prospective customers in the industry. Employee further agrees that, given the markets in which the Company competes, confidentiality of the Information is necessary without regard to any geographic limitation.

4. Both during and after Employee's employment with the Company, Employee agrees to retain the Information in absolute confidence and not to use the Information, or permit access to or disclose the Information to any person or organization without the Company's express written consent, except as required for Employee to perform Employee's job with the Company. Employee further agrees not to use the goodwill for the benefit of any person or entity other than the Company. Employee hereby agrees that upon cessation of Employee's employment, for whatever reason and whether voluntary or involuntary, or upon the request of the Company at any time, Employee will immediately surrender to the Company all of the property and other things of value in Employee's possession or in the possession of any person or entity under Employee's control that are the property of the Company, including without any limitation all personal notes, drawings, manuals, documents, photographs, or the like, including copies and derivatives thereof, relating directly or indirectly to any Information or New Developments, or relating directly or indirectly to the business of the Company.

2013 Agreement, ¶¶ 3-4.

5.7. In order to ensure enforcement of the confidentiality obligations set out above, prevent unfair competition, and protect CyrusOne's legitimate business interest, Levinsky also agreed to certain restrictive covenants:

5. Employee recognizes the need of the Company to prevent unfair competition and to protect the Company's legitimate business interests. Therefore, ancillary to the otherwise enforceable agreements set forth in this Agreement, and to avoid the actual or threatened misappropriation of the Information or goodwill, Employee agrees to the restrictive covenants set forth in this Agreement. Accordingly, Employee agrees that, during Employee's employment and for a period of one year following Employee's termination or separation (for any reason), Employee will not accept employment or engage in any business activity (whether as a principal, partner, joint venturer, agent, employee, salesperson, consultant, independent contractor, director or officer) with a "Competitor" of the Company where such employment or activity would involve Employee:

(i) providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products competitive with or similar to those services or products with which Employee had any involvement, and/or regarding which Employee had any Information, during Employee's employment with the Company (including any products or services being

researched or developed by the Company during Employee's employment with the Company); or

(ii) providing or performing services that are similar to any services that Employee provided to or performed for the Company during Employee's employment with the Company.

For purposes of this provision, a "Competitor" is any business or entity that, at any time during the one-year period following Employee's separation from employment, provides or seeks to provide, any products or services similar or related to any products sold or any services provided by the Company. "Competitor" includes, without limitation, any company or business that provides data colocation and related services to businesses or entities.

The restrictions set forth in this paragraph will be limited to the geographic areas (i) where Employee performed services for the Company, (ii) where Employee solicited or served the Company's customers or clients, or (iii) otherwise impacted or influenced by Employee's provision of services to the Company.

6.      During Employee's employment and for a period of one year following Employee's termination or separation from the Company for any reason, Employee will not, for the purpose of doing competitive business, directly or indirectly, through any person or entity, communicate with (i) any of the Company's customers known to Employee during his employment with the Company and from which the Company generated revenue during the one-year period preceding Employee's termination or separation; or (ii) any prospective customers known to Employee during the one-year period prior to Employee's termination or separation, for the purpose or intention of attempting to sell any Competitor's products or services or attempting to divert business of said customer or prospective customer from the Company to a Competitor.

2013 Agreement, ¶¶ 5-6.

5.8.      Because of the importance of the obligations set out in the Agreement, Levinsky

further agreed that any breach or threatened breach of the Agreement could result in material

damage and immediate and irreparable harm to CyrusOne:

Employee further agrees that any breach or threatened breach of this Agreement would result in material damage and immediate and irreparable harm to the Company. Employee further agrees that any breach of the covenant not to compete described herein would result in the inevitable disclosure of Company's confidential, proprietary and trade secret Information. Employee therefore agrees that the Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction, whether temporary, preliminary, or

permanent, in the event of any such breach or threatened breach by Employee. Employee acknowledges that the prohibitions and obligations contained in this Agreement are reasonable and do not prevent Employee's ability to use Employee's general abilities and skills to obtain gainful employment. Therefore, Employee agrees that Employee will not sustain monetary damages in the event that Company obtains a temporary, preliminary or permanent injunction to enforce this Agreement.

2013 Agreement, ¶ 14.

5.9.    The Agreement also contemplated that Levinsky may enter into other agreements with CyrusOne that contain restrictive covenants, and Levinsky agreed that, if the restrictions in other agreements were broader in scope, the broader agreement would control:

If any of the provisions in this Agreement conflict with similar provisions in any other document or agreement related to Employee's employment with Company, the provisions of this Agreement will apply; provided, however, if the restrictions set forth in the other document or agreement at issue are broader in scope than those in this Agreement and are enforceable under applicable law, those restrictions will apply. . . .

2013 Agreement, ¶ 17.

5.10.   On or about March 9, 2017, Levinsky entered into a Non-Disclosure and Non-Competition Agreement in connection with his acceptance of a Time-Based Restricted Stock Unit Award Under the Provisions of the CyrusOne Restated 2012 Long Term Incentive Plan, under which Levinsky was awarded certain Restricted Stock Units of the common stock of CyrusOne, Inc. A true and correct copy of that award and the accompanying Non-Disclosure and Non-Competition Agreement to which he agreed is attached to this Petition as Exhibit B. The restrictive covenants set out in the Non-Disclosure and Non-Competition Agreement attached to the 2017 Restricted Stock Unit Award are substantially similar to the restrictive covenant set out in the 2013 Agreement. (The 2017 Non-Disclosure and Non-Competition Agreement and the 2013 Agreement will collectively be referred to as the "Employment Agreements.")

5.11.   While employed by CyrusOne, Levinsky was entrusted with and had access to CyrusOne's confidential information as described and defined by the Employment Agreements. Indeed, Levinsky was a key member of CyrusOne's management team and responsible for relationships with customers that counted among its largest and most important accounts. All of the confidential information as described and defined by the Employment Agreements was of such a confidential and sensitive nature that disclosing it to a competitor would put CyrusOne at a competitive disadvantage.

5.12.   Levinsky resigned his employment with CyrusOne on November 9, 2018. He did not return his company issued laptop, despite statements to CyrusOne that he would, and he may still maintain access to CyrusOne files and data. Upon information and belief, Levinsky has improperly retained and used CyrusOne's confidential and trade secret information. In fact, Levinsky's CyrusOne laptop connected to the public internet as recently as January 3, 2019.

5.13.   The wrongful retention and use of Levinsky's CyrusOne laptop on January 3, 2019, is especially suspicious because, Levinsky recently disclosed that, as of January 2, 2019, he commenced employment with one of CyrusOne's direct competitors—Switch.

5.14.   Levinsky had not previously stated that, after his departure from CyrusOne, he intended to join a direct competitor. Nevertheless, on January 11, 2019, Levinsky informed CyrusOne that, effective January 2, 2019, he had commenced employment with Switch as an officer in its Connectivity Division.

5.15.   Switch has acknowledged in public filings with the Securities and Exchange Commission that it competes with CyrusOne. Specifically, in a recent 10-K report, Switch stated as follows: "We offer a broad range of data center services and, as a result, we may compete with a wide range of data center service providers for some or all of the services we offer. We face

competition from numerous developers, owners and operators in the data center industry, including . . . CyrusOne, Inc."

5.16.   Levinsky's work for Switch in its Connectivity Division entails work for a Competitor (as that term is defined in Levinsky's restrictive covenants) (a) providing, selling or attempting to sell, or assisting in the sale or attempted sale of, services and products competitive with or similar to those services or products with which Levinsky had involvement, or regarding which Levinsky had CyrusOne protected information, during his employment with CyrusOne, and (b) providing or performing services that are similar to services that Levinsky provided to or performed for the CyrusOne during his employment with the CyrusOne. Indeed, over the course of his career at CyrusOne, Levinsky sold connectivity services alongside leasing data center capacity and fully understands that both of these products are intimately linked.  As explained above, data center and connectivity products and services are intimately linked in that customers both (a) lease data center capacity and also (b) purchase connectivity services. Levinsky fully understands how these products are sold jointly together, and Switch too recognizes that its connectivity offerings are important in terms of attracting customers.

5.17.   Moreover, Levinsky's work for Switch in its Connectivity Division entails work for a Competitor in areas (a) where Levinsky performed services for the CyrusOne, (b) where Levinsky solicited or served CyrusOne's customers or clients, or (c) otherwise impacted or influenced by Levinsky's provision of services to the CyrusOne.

5.18.   Levinsky's role at CyrusOne was to sell data center services, telecommunication services, and other types of services offered by CyrusOne, to its customers. Levinsky repeatedly acknowledged during his employment with CyrusOne that Switch was a direct and vigorous

competitor, and that CyrusOne and Switch directly competed against one another for specific customers.

5.19.  Indeed, while CyrusOne has data centers in various specific locations in, for example the United States, those data centers provide connectivity and cloud solutions (i.e., products and services) for CyrusOne customers who desire to obtain CyrusOne's assistance to serve the customers' own networking needs over broad geographical areas, as most customers make data center location decisions that are not solely dependent upon geographic location for a variety of reasons. Switch's customers are also broadly located in geographical areas even where Switch does not have a physical location.

5.20.  Levinsky's work for Switch thus violates his obligations under the Employment Agreements.

**6.**
**COUNT 1 – BREACH OF CONTRACT**

6.1.    CyrusOne incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

6.2.    CyrusOne and Levinsky are parties to valid and enforceable contracts entered into during Levinsky's employment.

6.3.    CyrusOne performed its obligations under the Employment Agreements and all conditions precedent have occurred or, in the alternative, have been waived.

6.4.    Despite agreeing to the contractual obligations and prohibitions described above, Levinsky has violated the terms of the Employment Agreements.

6.5.    Levinsky breached the Employment Agreements by (i) retaining confidential and proprietary information without CyrusOne's written authorization; and (ii) going to work for Switch immediately following his resignation from CyrusOne.

6.6.     CyrusOne has been and continues to be damaged by Levinsky's actions and conduct in an undetermined amount of damages to its business including, but not limited to, lost profits, loss of clients, and loss of business opportunities.

6.7.     As a direct and proximate result of Levinsky's breach of the Employment Agreements, CyrusOne has suffered and will continue to suffer, immediate and irreparable injury, the exact extent, nature, and amount of which is currently impossible to ascertain.

## 7.
## REQUEST FOR REFORMATION

7.1.     To the extent that the Court should find that any term or provision, or portion of a term or provision, of the Employment Agreements is unenforceable as a matter of law or public policy, CyrusOne requests that the Court modify any such term or provision, or portion of a term or provision, as may be necessary.

## 8.
## COUNT 2 – CONVERSION

8.1.     CyrusOne incorporates by reference and re-alleges each allegation contained in the above-numbered paragraphs.

8.2.     Levinsky has wrongfully exercised dominion and control over CyrusOne's property for his own benefit, use, and enjoyment.

8.3.     As a direct and proximate result of Levinsky's wrongful conduct, CyrusOne has suffered and will continue to suffer, immediate and irreparable injury, the exact extent, nature, and amount of which is currently impossible to ascertain.

## 9.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER
## AND TEMPORARY INJUNCTION

9.1.     CyrusOne incorporates by reference and re-alleges each allegation contained in the above-numbered Paragraphs.

9.2.    CyrusOne further moves the Court for the entry of a Temporary Restraining Order as well as a Temporary Injunction to maintain the status quo and (i) to prevent Levinsky or anyone else acting in concert or participation with him from directly or indirectly soliciting any customer of CyrusOne during the one-year time frame provided by the Employment Agreements; (ii) to prevent Levinsky or anyone acting in concert or active participation with him from using CyrusOne's confidential and proprietary information including, but not limited to information retained by Levinsky following the termination of his employment; and (iii) to prevent Levinsky or anyone acting in concert or active participation with him from further breaching the Employment Agreements or facilitating any breach of the Employment Agreements by Levinsky.

9.3.    CyrusOne has shown a probability of recovery on the merits of its claims based on Levinsky's ongoing breach of the Employment Agreements and conversion of CyrusOne's property. Specifically as to the breach of the Employment Agreements, they contain promises that Levinsky would obtain and receive CyrusOne's goodwill and confidential, proprietary, and/or trade secret information; Levinsky in fact received such consideration; in exchange, Levinsky promised to keep that information confidential and not use that information for any person or entity other than CyrusOne and to return such information upon the termination of his employment; and to enforce that promise, Levinsky agreed to the restrictive covenants described above. Further the restrictions in the Agreements are reasonably calculated to protect CyrusOne's legitimate business interests and are reasonable in time, geography and scope of activity restrained. Alternatively, to the extent they are not reasonable in time, geography and scope, CyrusOne only seeks to enforce them to the extent they are reasonable.

9.4.    CyrusOne faces probable imminent, ongoing, and irreparable injury for which there is no adequate remedy at law. The harm that will be caused to CyrusOne by Levinsky's

breach of his non-solicitation, non-disclosure, and non-compete obligations is imminent because Switch is a competitor of CyrusOne. Should injunctive relief not be entered, in all probability, Levinsky will interfere with CyrusOne's business by breaching his legal obligations to CyrusOne. Such interference will permanently impair and irreparably harm CyrusOne's ability to compete in the marketplace, a harm that is difficult to measure and which cannot be readily repaired. Moreover, Levinsky is an individual and would likely be unable to satisfy any money judgment entered against him. Accordingly, absent injunctive relief by this Court, CyrusOne will suffer irreparable injury for which there is no adequate remedy at law.

9.5.    Finally, Levinsky expressly acknowledged and agreed in his Employment Agreements that CyrusOne would suffer imminent and irreparable harm if he violated the non-competition and non-solicitation provisions, and he agreed that CyrusOne would be entitled to injunctive relief if he violated such provisions. Moreover, CyrusOne is entitled to temporary and permanent injunctive relief pursuant to Tex. Bus. & Comm. Code, §§ 15.50-15.52, and has satisfied the standards for injunctive relief contained therein

9.6.    CyrusOne is ready and willing to post a bond as required by law. For the reasons stated herein, CyrusOne respectfully requests that the Court enter a Temporary Restraining Order (and subsequently, a Temporary Injunction) enjoining Levinsky, his agents, employees, representatives, attorneys, and those in active concert or participation with him who receive actual notice of the Temporary Order:

> (a) from providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products competitive with or similar to those services or products with which Levinsky had any involvement, and/or regarding which Levinsky had any CyrusOne Confidential Information, during his employment with CyrusOne (including any products or services being researched or developed by CyrusOne during Levinsky's employment with CyrusOne) anywhere within the United States;

(b) from providing or performing services anywhere within the United States that are similar to any services that Levinsky provided to or performed for the CyrusOne during his employment with CyrusOne;

(c) from communicating with (i) any of the CyrusOne's customers known to Levinsky during his employment with CyrusOne and from which CyrusOne generated revenue during the one-year period preceding Levinsky's termination or separation for the purpose of doing competitive business, directly or indirectly, through any person or entity, or (ii) any prospective customers known to Levinsky during the one-year period prior to his termination or separation, for the purpose or intention of attempting to sell any of Switch's products or services or attempting to divert business of said customer or prospective customer from CyrusOne to Switch;

(d) from disclosing any confidential or proprietary information regarding CyrusOne, its customers, and its working relationships with its customers to any third party, including to Switch; and

(e) to return to CyrusOne, through delivery to CyrusOne's counsel of record, any CyrusOne property in Levinsky's possession, custody, or control and all documents, files, data, and electronic transmissions or copies thereof, constituting, containing, embodying, or based upon any of CyrusOne's Confidential Information immediately upon notice of the entry of this Order.

9.7. Severe harm will be sustained by CyrusOne if Levinsky is not restrained as requested.

9.8. Levinsky is not likely to be prejudiced by such an injunction. Indeed, Levinsky expressly agreed on multiple occasions that violation of the non-disclosure, non-solicitation, and non-competition provisions of the Employment Agreements would entitle CyrusOne to an injunction as a matter of right. Thus, the balancing of hardships favors the issuance of the requested temporary restraining order. Further, a temporary injunction will not impose an undue hardship on Levinsky because he can continue to seek a livelihood by methods that do not violate the terms of the Employment Agreements.

9.9.     Finally, issuing the requested temporary restraining order will maintain the last legal status quo until such time as this Court can take evidence to determine whether to issue a temporary injunction to protect CyrusOne's rights.

9.10.    For the reasons stated above, CyrusOne moves the Court for the entry of a Temporary Restraining Order against Levinsky and his agents, employees, representatives, attorneys, and those in active concert or participation within them who receive actual notice of such Temporary Restraining Order to maintain the status quo.

9.11.    CyrusOne is entitled to injunctive relief as it has satisfied the standards necessary for such relief.

9.12.    In addition to the above-requested relief, CyrusOne requests the Court set a hearing for temporary injunction within fourteen days of the entry of a temporary restraining order in this case or as soon as possible and that Levinsky be commanded to appear and show cause why a temporary injunction should not be issued.

## 10.
## ATTORNEY'S FEES

10.1.    Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, the Agreement, and any other applicable statutes, CyrusOne is entitled to and hereby seeks its attorney's fees in prosecuting this action.

## 11.
## CONDITIONS PRECEDENT

11.1.    For each cause of action alleged in this Petition, all conditions precedent have been satisfied.

**12.**
## REQUEST FOR DISCLOSURE

12.1.   Pursuant to Texas Rule of Civil Procedure 194, CyrusOne requests that Levinsky disclose, within fifty (50) days of the service of this request, or at the time required by the Court, the information or material described in Rule 194.2.

**13.**
## PRAYER

WHEREFORE, Plaintiff CyrusOne requests that Defendant Stuart Levinsky be cited to appear and to answer, and that the Court award CyrusOne:

a.   Injunctive relief as requested above, first in the manner of a temporary restraining order, then as a preliminary injunction, and finally, to the extent necessary and appropriate, as a permanent injunction;

b.   Judgment against Levinsky for compensatory damages to be proven in this litigation, including lost profits, lost sales, loss of customers, and loss of business opportunities;

c.   Judgment against Levinsky for a sum to be requested at trial representing exemplary and/or punitive damages for his malicious and intentional and/or wrongful conduct;

d.   Costs and attorneys' fees;

e.   Prejudgment and post-judgment interest at the highest rate permitted by law; and

f.   Such other and further relief to which the law and equity may deem CyrusOne entitled.

Respectfully submitted,

**JACKSON WALKER L.L.P.**

By: */s/ W. Ross Forbes, Jr.*
W. Ross Forbes, Jr.
State Bar No. 00796564
Scott M. McElhaney
State Bar No. 00784555
Eric D. Wong
State Bar No. 24102659
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6000
Fax: (214) 661-5822
Email: rforbes@jw.com
Email: smcelhaney@jw.com
Email: ewong@jw.com

and

Curtis Loveless
State Bar No. 12607000
Darcy E. Loveless
State Bar No. 24013062
**LOVELESS & LOVELESS**
   **ATTORNEYS AT LAW, LP**
218 N. Elm St.
Denton, Texas 76201
Telephone: (940) 387-3776
Fax: (940) 898-0196
Email: curtis@cmloveless.com
Email: darcy@cmloveless.com

**ATTORNEYS FOR PLAINTIFFS**

<u>**LOCAL RULE 2.1**</u>
<u>**ATTORNEY'S CERTIFICATE FOR EX PARTE RELIEF**</u>

I certify that to the best of my knowledge, the party against whom relief is sought ex parte is not represented by counsel in the matter made the basis of the relief sought.

*/s/ W. Ross Forbes, Jr.*
W. Ross Forbes, Jr.

---

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Kellie Teal-Guess, being first duly sworn, deposes and says that she is Executive Vice President and Chief People Officer of CyrusOne, Inc.; that she has personal knowledge of all the facts recited in Section 5 of Plaintiff's Original Petition and Application for Temporary Restraining Order and Injunctive Relief and that said facts are true and correct; and that therefore, the facts contained in this Petition are verified on behalf of the Plaintiffs in this litigation.

_Kellie Teal-Guess_
Kellie Teal-Guess

SUBSCRIBED AND SWORN TO before me by Kellie Teal-Guess on this the 14 day of January, 2019, to certify which witness my hand and seal of office.

_Maria Carvajal_
Notary Public, State of Texas

My Commission Expires:

1-30-2023



# Exhibit A

## NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

**CyrusOne** and its subsidiaries and affiliates (collectively, the "Company") require certain employees to sign non-disclosure and non-competition agreements ("Agreement") as part of the Company's efforts to protect its confidential information and goodwill, and to maintain its competitive position. In consideration of employment, promotion, the provision of confidential information and goodwill and/or other valuable consideration, the employee ("Employee") entering into this Agreement agrees as follows:

1.      The Company provides colocation and associated services to businesses.

2.      In conducting its business, the Company develops and utilizes, among other things, technology, data, research and development, concepts, goodwill, customer relationships, training, and trade secrets. The success of the Company and each of its employees is directly predicated on the protection of the Company's goodwill and its confidential, proprietary, and/or trade secret information. Employee acknowledges that in the course of employment with the Company, Employee will be entrusted with, have access to and obtain goodwill belonging to the Company and intimate, detailed, and comprehensive knowledge of confidential, proprietary, and/or trade secret information ("Information") that Employee did not have or have access to prior to signing this Agreement, including some or all of the following: (1) information concerning the Company's products and services; (2) information concerning the Company's customers, suppliers and employees; (3) information concerning the Company's advertising and marketing plans; (4) information concerning the Company's strategies, plans, goals, projections, and objectives; (5) information concerning the Company's research and development activities and initiatives; (6) information concerning the strengths and weaknesses of the Company's products or services; (7) information concerning the costs, profit margins, and pricing associated with the Company's products or services; (8) information concerning the Company's sales strategies, including the manner in which it seeks to position its products and services in the market; (9) financial information concerning the Company's business, including budgets and margin information, and (10) other information considered confidential by the Company. Employee may also be entrusted with and have access to Third Party Information. The term Third Party Information means confidential or trade secret information that the Company may receive from third parties or information which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for limited purposes.

3.      Employee agrees that the Information and goodwill are highly valuable, provide a competitive advantage to the Company and allow Employee a unique competitive opportunity and advantage in developing business relationships with the Company's current or prospective customers in the industry. Employee further agrees that, given the markets in which the Company competes, confidentiality of the Information is necessary without regard to any geographic limitation.

4.      Both during and after Employee's employment with the Company, Employee agrees to retain the Information in absolute confidence and not to use the Information, or permit access to or disclose the Information to any person or organization, except as required for Employee to perform Employee's job with the Company. Employee further agrees not to use the

goodwill for the benefit of any person or entity other than the Company. Employee hereby agrees that upon cessation of Employee's employment, for whatever reason and whether voluntary or involuntary, or upon the request of the Company at any time, Employee will immediately surrender to the Company all of the property and other things of value in his possession or in the possession of any person or entity under Employee's control that are the property of the Company, including without any limitation all personal notes, drawings, manuals, documents, photographs, or the like, including copies and derivatives thereof, relating directly or indirectly to any Information or New Developments, or relating directly or indirectly to the business of the Company.

5.    Employee recognizes the need of the Company to prevent unfair competition and to protect the Company's legitimate business interests. Therefore, ancillary to the otherwise enforceable agreements set forth in this Agreement, and to avoid the actual or threatened misappropriation of the Information or goodwill, Employee agrees to the restrictive covenants set forth in this Agreement. Accordingly, Employee agrees that, during Employee's employment and for a period of one year following Employee's termination or separation (for any reason), Employee will not accept employment or engage in any business activity (whether as a principal, partner, joint venturer, agent, employee, salesperson, consultant, independent contractor, director or officer) with a "Competitor" of the Company where such employment would involve Employee:

        (i)    providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products competitive with or similar to those services or products with which Employee had any involvement, and/or regarding which Employee had any Information, during Employee's employment with the Company (including any products or services being researched or developed by the Company during Employee's employment with the Company); or

        (ii)    providing or performing services that are similar to any services that Employee provided to or performed for the Company during Employee's employment with the Company.

For purposes of this provision, a "Competitor" is any business or entity that, at any time during the one year period following Employee's termination or separation, provides or seeks to provide, any products or services similar or related to any products sold or any services provided by the Company. "Competitor" includes, without limitation, any company or business that provides data colocation and related services to businesses or entities.

The restrictions set forth in this paragraph will be limited to the geographic areas (i) where Employee performed services for the Company, (ii) where Employee solicited or served the Company's customers or clients, or (iii) otherwise impacted or influenced by Employee's provision of services to the Company.

6.    During Employee's employment and for a period of one year following Employee's termination or separation from the Company for any reason, Employee will not, for the purpose of doing competitive business, directly or indirectly, through any person or entity, communicate with (i) any of the Company's customers known to Employee during his employment with Company and from which the Company generated revenue during the one year

preceding Employee's termination or separation; or (ii) any prospective customers known to Employee during the one-year period prior to Employee's termination or separation, for the purpose or intention of attempting to sell any Competitor's products or services or attempting to divert business of said customer or prospective customer from the Company to a Competitor.

7.  In the event Employee is uncertain as to the application of this Agreement to any contemplated employment opportunity or business activity, Employee agrees to inquire in writing of the Company's Department of Human Resources, specifying the contemplated opportunity or activity.  The Company will attempt to respond within ten (10) business days following receipt of said writing.  In no event will the Company's failure to respond within ten business days constitute a waiver of any of the provisions of this Agreement.

8.  All ideas, inventions, discoveries, concepts, trademarks, or other developments or improvements, whether patentable or not, conceived by Employee, alone or with others, at any time during the term of Employee's employment, whether or not during working hours or on Employer's premises, which are within the scope of or related to the business operations of the Company ("New Developments"), shall be and remain the exclusive property of the Company. Employee shall do all things reasonably necessary to ensure ownership of such New Developments by the Company, including the execution of documents assigning and transferring to the Company, all of Employee's rights, title, and interest in and to such New Developments, and the execution of all documents required to enable the Company to file and obtain patents, trademarks, and copyrights in the United States and foreign countries on any of such New Developments.

9.  Employee will not disparage the Company in any way which could adversely affect the goodwill, reputation, and business relationships of the Company with the public generally, or with any of their customers, suppliers, or employees.

10. During Employee's employment by the Company and for a period of one year following Employee's termination or separation (for any reason), Employee will not, directly or indirectly, induce or seek to induce any other employee of the Company to terminate his/her employment relationship with the Company, nor will Employee, directly or indirectly, induce or seek to induce any other employee of the Company to accept employment with a Competitor, nor will Employee be involved in the hiring of any other employee of the Company on behalf of any person or entity other than the Company.  Without limitation, Employee will not directly or indirectly, induce or seek to induce any other current or former employee of the Company to violate any of his/her non-compete and/or non-solicitation and/or non-disclosure and/or non-disparagement agreement(s) with the Company.

11. During Employee's employment by the Company and for a period of one year following Employee's termination or separation (for any reason), Employee will, before accepting an offer of employment from any person or entity, provide such person or entity a copy of this Agreement.  Employee authorizes the Company to provide a copy of this Agreement to any and all future employers of Employee.

12. Employee represents that Employee is not bound by any agreement or other duty to a former employer or any other party that would prevent Employee from complying with any obligations hereunder.

13. Employee further agrees and consents that this Agreement and the rights, duties, and obligations contained in it may be and are fully transferable and/or assignable by the Company, and shall be binding upon and inure to the benefit of the Company's successors, transferees, or assigns.

14. Employee further agrees that any breach or threatened breach of this Agreement would result in material damage and immediate and irreparable harm to the Company. Employee further agrees that any breach of the covenant not to compete described herein would result in the inevitable disclosure of Company's confidential, proprietary and trade secret Information. Employee therefore agrees that the Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction, whether temporary, preliminary, or permanent, in the event of any such breach or threatened breach by Employee. Employee acknowledges that the prohibitions and obligations contained in this Agreement are reasonable and do not prevent Employee's ability to use Employee's general abilities and skills to obtain gainful employment. Therefore, Employee agrees that Employee will not sustain monetary damages in the event that Company obtains a temporary, preliminary or permanent injunction to enforce this Agreement.

15. If in any judicial proceeding, a court refuses to enforce any of the restrictive covenants (or any part thereof) in this Agreement, then such unenforceable covenant(s) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants to be enforced. In the event that any of the restrictive covenants are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provision shall be reformed to the maximum time, geographic or scope limitation, as the case may be, then permitted by such law. Furthermore, it is agreed that any period of restriction or covenant hereinabove stated shall not include any period of violation or period of time required for litigation or arbitration to enforce such restrictions or covenants.

16. Employee agrees that this Agreement shall be governed by the laws of the State of Texas, without giving effect to any conflict of law provisions. Employee further voluntarily consents and agrees that the state or federal courts located in Denton County, Texas: (i) must be utilized solely and exclusively to hear any action arising out of or relating to this Agreement; and (ii) are a proper venue for any such action and Employee consents to the exercise by such court of personal jurisdiction over Employee for any such action.

17. If any of the provisions in this Agreement conflict with similar provisions in any other document or agreement related to Employee's employment with Company, the provisions of this Agreement will apply; provided, however, if the restrictions set forth in the other document or agreement at issue are broader in scope that those in this Agreement and are enforceable under applicable law, those restrictions will apply. To the extent that any portion of this Agreement is deemed unenforceable as to the application to specific facts and circumstances, such portion may, without invalidating the remainder of the Agreement, be modified to the limited extent necessary to cure such unenforceability.

NON-COMPETE

18. This Agreement does not obligate Company to employ Employee for any period of time and Employee's employment is "at will."

**EMPLOYEE**

Date: MARCH 25, 2013

Signature

STUART LEVINSKY
Type or Print Name

# Exhibit B

March 09, 2017

## TIME-BASED RESTRICTED STOCK UNIT AWARD
## UNDER THE PROVISIONS OF THE
## CYRUSONE RESTATED 2012 LONG TERM INCENTIVE PLAN

**Name of Employee:**                 **LEVINSKY, STUART**
**Award Date:**                         **February 13, 2017**
**Number of Restricted Stock Units:**     **810**

      Pursuant to the provisions of the CyrusOne Restated 2012 Long Term Incentive Plan (as in effect from time to time (the "**Plan**")), the Board of Directors of CyrusOne Inc. hereby grants to the employee named above ("**you**" or the "**Employee**") on the date noted above (the "**Award Date**") an award (the "**Award**") of time-based Restricted Stock Units ("**RSU**s") with respect to the common stock of CyrusOne Inc., on and subject to the terms of the Plan and your agreement to the terms, conditions and restrictions contained herein and subject to the vesting criteria contained herein. Capitalized terms used in this time-based Restricted Stock Unit award agreement (this "**Agreement**") that are not defined in this Agreement have the meanings as used or defined in the Plan.

      1.       <u>Vesting</u>. Except as otherwise provided in any Employment Agreement (as defined in Section 14 hereof) or determined by the Committee in its sole discretion or provided in Section 2, 3, 4 or 5 hereof, the RSUs shall vest in three approximately equal installments on each anniversary of the Award Date (each, a "**Vesting Date**") provided that you are continuously employed by the Company through each such Vesting Date.

      2.       <u>Vesting Upon Death</u>. Except as otherwise provided in any Employment Agreement, in the event of your death while an Employee, then, effective as of the date of your death, you will become vested in the number of RSUs (rounded up to the nearest whole RSU) that bears the same ratio to the total number of RSUs granted pursuant to this Award Agreement as the number of days from the Award Date through the date of your death bears to 1,096. Any RSUs that are not vested pursuant to the calculation described in the preceding sentence shall be forfeited to CyrusOne as of your date of death in accordance with the terms of Section 6 hereof.

      3.       <u>Vesting Upon Disability</u>. If pursuant to the applicable disability provision of any Employment Agreement, you become disabled and as a result thereof cease to be an Employee or, if no such provision exists or you are not party to an Employment Agreement, you become disabled to such extent that you are unable to perform the usual duties of your job for a period of 12 consecutive weeks or more and, as the result thereof, the Committee approves the termination of your employment within the 12-month period following the first day of such 12 consecutive week period, then, effective as of the date of your termination of employment, you will become vested in the number of RSUs (rounded up to the nearest whole RSU) that bears the same ratio to the total number of RSUs granted pursuant to this Award Agreement as the number of days from the Award Date through the date of your termination of employment bears to 1,096. Any RSUs that are not vested after the calculation described in the preceding sentence shall be forfeited to CyrusOne as of the date of your termination of employment in accordance with the terms of Section 6 hereof.

      4.       <u>Vesting Upon Termination of Employment Other than for Death, Disability or Cause</u>. Except as otherwise provided in any Employment Agreement, if the Company terminates your employment other than by reason of your death or disability or other than for Cause, then, effective as of the date of your termination of employment, you will become vested in the number of RSUs (rounded up to the nearest whole RSU) that bears the same ratio to the total number of RSUs granted pursuant to this Award Agreement as the number of days from the Award Date through the date of your termination of employment bears to 1,096. Any Shares that are not vested after the calculation described in the preceding sentence shall be forfeited to CyrusOne as of your termination of employment accordance with the terms of Section 6 hereof. For purposes of this Agreement, "**Cause**" shall have the meaning set forth in any Employment Agreement, or, if you do not have an Employment Agreement, shall mean the occurrence of any one of the following: (i) your material dereliction of your duties, your gross negligence or substantial failure to perform your duties with the Company (other than any such failure resulting from incapacity due

to physical or mental illness); (ii) your engaging in (A) misconduct that is materially injurious to the Company or (B) illegal conduct; (iii) your material breach of any written agreement by and between you and the Company; (iv) your violation of any material provision of the Company's Code of Business Conduct and Ethics; or (v) your willful failure to cooperate in good faith with an investigation by any governmental authority.

5.  **Vesting Upon Termination of Employment After a Change in Control**.  If a Change in Control occurs, and the acquiring corporation either assumes this award of RSUs, or substitutes new awards with respect to stock of the acquiring corporation, the RSUs will not vest upon the Change in Control; provided, however, that subject to the terms of any Employment Agreement and notwithstanding any other provision of this Agreement to the contrary, in the event that within twelve months following a Change in Control your employment is terminated by the Company other than for Cause, then, effective as of the date of your termination of employment, you will become fully vested with respect to all of the RSUs granted pursuant to this Award Agreement that have not previously been vested. In the event a Change in Control occurs and the acquiring corporation does not assume this award of RSUs or provide substitute awards, you will become fully vested with respect to all of the RSUs granted in this Award that have not previously been vested.

6.  **Forfeiture**.  Except as otherwise determined by the Committee or provided in Sections 1, 2, 3, 4, or 5 hereof or any Employment Agreement, any RSUs that remain unvested on the date of your termination of employment shall be forfeited.

7.  **Settlement**.  Vested RSUs shall be settled no later than 60 days after such RSUs become vested in accordance with Sections 1, 2, 3, 4 or 5 above by delivering to you a number of shares of CyrusOne Inc. common stock ("**Shares**") equal to the number of vested RSUs.  The Company may deliver the Shares by delivery of physical certificates or by certificate-less book-entry issuance.

8.  **Voting**.  You shall not have any voting rights with respect to the RSUs prior to the issuance of Shares in settlement of vested Earned RSUs.  Upon settlement of the Earned RSUs and issuance of Shares, you will be entitled to all rights of a shareholder.

9.  **Dividend Equivalents**.  Each RSU granted hereunder is hereby granted in tandem with a corresponding right to receive an amount equal to each dividend that is made by the Company in respect of a Share underlying the RSU to which such dividend relates (a "**Dividend Equivalent**"). Any such amounts shall be paid within ten (10) days following the date such dividend is payable to shareholders, provided that you are employed with the Company on the date of payment. Any Dividend Equivalent granted in tandem with an RSU shall terminate upon the forfeiture of such RSU or the payment of an Earned RSU, as applicable.Any Dividend Equivalents payable under the Plan will be treated as separate payments from the underlying RSUs for purposes of Section 409A. There will be no reinvestment option or earned interest credits on any Dividend Equivalent.

10.  **Employment**.  For purposes of this Agreement, you shall be deemed to be an "Employee" while, and only while, you are in the employ of the Company and considered to be employed under the policies and procedures (including the payroll and withholding procedures) of the Company.  In this regard, the granting of this Agreement does not constitute a contract of employment and does not give you the legal right to be continued as an Employee.

11.  **Interpretation**.  You acknowledge that the Committee has the authority to construe and interpret the terms of the Plan and this Agreement if and when any questions of meaning arises under the Plan or this Agreement, and any such construction or interpretation shall be binding on you, your heirs, executors, administrators, personal representatives and any other persons having or claiming to have an interest in the Shares.

12.  **Withholding**.  You are responsible for all federal, state and local income and employment taxes payable with respect to the RSUs and the delivery of Shares upon settlement of the RSUs.  Unless you otherwise make arrangements satisfactory to the Company regarding the payment of any such tax, upon vesting of the RSUs, the Company shall withhold a number of Shares having a market value equal to the amount of taxes required to be withheld. Otherwise, the Company may, at its discretion and to the extent it determines is necessary to pay such withholding tax amount, withhold any such withholding tax amount from your salary or any other compensation payable to you.

13.    Notices.  All notices and other communications to be given hereunder shall be in writing and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, first class postage prepaid, and addressed to the General Counsel of the Company at the Company's principal corporate office, or to the employee at the address on file with the Company, or to any other address as to which notice has been given in the manner herein provided.

14.    Effect of Employment Agreement.  Notwithstanding any of the terms of the foregoing sections of this Agreement, if the provisions of a written employment agreement between you and the Company (any such agreement, an "**Employment Agreement**") would require that the RSUs be vested earlier than when such RSUs are vested under the terms of the foregoing sections of this Agreement, then such Employment Agreement provisions shall control (and shall be deemed an amendment to this Agreement and incorporated herein by reference).  In the event of any conflict between the terms of the Plan, on the one hand, and the terms of this Agreement or any Employment Agreement, on the other hand, the terms of the Plan shall govern.  In the event of any conflict between the terms of this Agreement and the terms of any Employment Agreement, the terms of such Employment Agreement shall govern.

15.    Miscellaneous.

(a)    This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns.  Subject to the provisions of the Plan and any applicable Employment Agreement, this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and shall be construed and interpreted in accordance with the laws of the State of Texas.  If any provisions of this Agreement shall be deemed to be invalid or void under any applicable law, the remaining provisions hereof shall not be affected thereby and shall continue in full force and effect.

(b)    In consideration of the Shares granted to you pursuant to this Agreement, you agree to execute (via electronic grant acceptance) the Non-Disclosure and Non-Competition Agreement attached as Exhibit A (the "**Non-Competition Agreement**").

(c)    The Committee may waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate this Agreement prospectively or retroactively; provided, however, that any such waiver, amendment, alteration, suspension, discontinuance, cancelation or termination that would materially and adversely impair your rights hereunder shall not to that extent be effective without your consent (it being understood, notwithstanding the foregoing proviso, that this Agreement and the Shares shall be subject to the provisions of Sections 17, 18 and 20 of the Plan).

(d)    In the event of any adjustments in authorized Shares as provided in Article 18 of the Plan, the number of RSUs and Shares or other securities to which you are entitled pursuant to this Agreement shall be appropriately adjusted or changed to reflect such change, provided that any such additional RSUs, Shares or additional or different shares or securities shall remain subject to the restrictions in this Agreement.

(e)    Unless the Committee specifically determines otherwise, the RSUs are personal to you and the RSUs may not be sold, assigned, transferred, pledged or otherwise encumbered other than by will or the laws of descent and distribution.  Any such purported transfer or assignment shall be null and void.

(f)    All disputes, controversies and claims arising between you and CyrusOne concerning the subject matter of this Agreement or the Plan shall be settled by arbitration in accordance with the rules and procedures of the American Arbitration Association in effect at the time that the arbitration begins, to the extent not inconsistent with this Agreement or the Plan.  The location of the arbitration shall be Dallas, Texas or such other place as the parties to the dispute may mutually agree.  In rendering any award or ruling, the arbitrator or arbitrators shall determine the rights and obligations of the parties according to the substantive and procedural laws of the State of Texas.  The arbitration shall be conducted by an arbitrator selected in accordance with the aforesaid arbitration procedures.  Any arbitration pursuant to this Section 15(f) shall be final and binding on the parties, and judgment upon any award rendered in such arbitration may be entered in

any court, Federal or state, having jurisdiction.  The parties to any dispute shall each pay their own costs and expenses (including arbitration fees and attorneys' fees) incurred in connection with arbitration proceedings and the fees of the arbitrator shall be paid in equal amounts by the parties.  Nothing in this Section 15(f) shall preclude you or CyrusOne from seeking temporary injunctive relief from any Federal or state court located within the State of Texas in connection with or as a supplement to an arbitration hereunder.

(g)   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. The counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof. Headings used throughout this Agreement are for convenience only and shall not be given legal significance.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "but not limited to".  The term "or" is not exclusive.

(h)   This Agreement and this award of RSUs is intended to satisfy the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**") and any regulations or guidance that may be adopted thereunder from time to time and shall be interpreted by the Committee as it determines necessary or appropriate in accordance with Section 409A to avoid a plan failure under Section 409A(a)(1).  To ensure compliance with Section 409A, (i) under all circumstances, vested RSUs that have not otherwise been forfeited shall be settled by delivery of the Shares (or if applicable, cash) no later than March 15th of the year following the year in which the RSUs vest, and (ii) this Agreement is subject to the provisions of Section 21.11 of the Plan (including the six-month delay, if applicable).  Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company, and in no event may the Employee, directly or indirectly, designate the calendar year of any payment. This Section 14(h) does not create any obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Section 409A. The Company will have no liability to you or any other party if the RSUs, the delivery of Shares (or cash) upon settlement of the RSUs or any other payment hereunder that is intended to be exempt from, or compliant with, Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto.

15.   <u>Electronic Delivery and Acceptance of Award</u>.  By accepting this Award, you agree to participate in the Plan through an on-line or electronic system maintained by the Company or a third party designated by the Company and to accept electronic delivery of any documents, communications or other information that the Company may be required to deliver in connection with the Plan or this Award. Electronic delivery of a document may be via e-mail or by reference to a location on the Company's intranet site or the internet site of a designated third-party vendor involved in administering the Plan. This Award and Agreement (including any Schedules or Exhibits attached hereto or incorporated by reference herein) can be accepted and signed via your on-line equity account accessible at https://www.benefits.ml.com.  Please note that if you do not accept the Award (including the non-disclosure and non-competition agreement) within 30 days of the Award Date, the Award may be forfeited.

<div align="center">

EXHIBIT A
**NON-DISCLOSURE AND NON-COMPETITION AGREEMENT**

</div>

**CyrusOne LLC** and its subsidiaries and affiliates (collectively, the "Company") require certain employees to sign non-disclosure and non-competition agreements ("Agreement") as part of the Company's efforts to protect its confidential information and goodwill, and to maintain its competitive position.  In consideration of employment, promotion, the provision of confidential information and goodwill and/or other valuable consideration, the employee ("Employee") entering into this Agreement agrees as follows:

1.   The Company provides colocation and associated services to businesses.

2.       In conducting its business, the Company develops and utilizes, among other things, technology, data, research and development, concepts, goodwill, customer relationships, training, and trade secrets. The success of the Company and each of its employees is directly predicated on the protection of the Company's goodwill and its confidential, proprietary, and/or trade secret information. Employee acknowledges that in the course of employment with the Company, Employee will be entrusted with, have access to and obtain goodwill belonging to the Company and intimate, detailed, and comprehensive knowledge of confidential, proprietary, and/or trade secret information ("Information") that Employee did not have or have access to prior to signing this Agreement, including some or all of the following: (1) information concerning the Company's products and services; (2) information concerning the Company's customers, suppliers and employees; (3) information concerning the Company's advertising and marketing plans; (4) information concerning the Company's strategies, plans, goals, projections, and objectives; (5) information concerning the Company's research and development activities and initiatives; (6) information concerning the strengths and weaknesses of the Company's products or services; (7) information concerning the costs, profit margins, and pricing associated with the Company's products or services; (8) information concerning the Company's sales strategies, including the manner in which it seeks to position its products and services in the market; (9) financial information concerning the Company's business, including budgets and margin information, and (10) other information considered confidential by the Company. Employee may also be entrusted with and have access to Third Party Information. The term "Third Party Information" means confidential or trade secret information that the Company may receive from third parties or information which is subject to a duty on the Company's part to maintain the confidentiality of such Third Party Information and to use it only for limited purposes. The terms "Information" and "Third Party Information" do not include information that becomes generally available to the public other than as a result of unauthorized disclosure by Employee.

3.       Employee agrees that the Information and goodwill are highly valuable, provide a competitive advantage to the Company and allow Employee a unique competitive opportunity and advantage in developing business relationships with the Company's current or prospective customers in the industry. Employee further agrees that, given the markets in which the Company competes, confidentiality of the Information is necessary without regard to any geographic limitation.

4.       Both during and after Employee's employment with the Company, Employee agrees to retain the Information and Third Party Information in absolute confidence and not to use the Information or Third Party Information, or permit access to or disclose the Information or Third Party Information to any person or organization without the Company's express written consent, except as required for Employee to perform Employee's job with the Company or as otherwise provided in <u>Section 19</u>below. Employee's obligations set forth in the preceding sentence are in addition to any other obligations Employee has to protect the Information and Third Party Information, including obligations arising under the Company's policies, ethical rules, and applicable law. Employee further agrees not to use the goodwill for the benefit of any person or entity other than the Company. Employee hereby agrees that upon cessation of Employee's employment, for whatever reason and whether voluntary or involuntary, or upon the request of the Company at any time, Employee will immediately surrender to the Company all of the property and other things of value in Employee's possession or in the possession of any person or entity under Employee's control that are the property of the Company, including without any limitation all personal notes, drawings, manuals, documents, photographs, or the like, including all electronically stored information, as well as any copies and derivatives thereof, relating directly or indirectly to any Information or New Developments (as defined below), or relating directly or indirectly to the business of the Company, or, with the Company's written consent, shall destroy such copies of such materials, including any copies stored in electronic format.

5.       Employee recognizes the need of the Company to prevent unfair competition and to protect the Company's legitimate business interests. Therefore, ancillary to the otherwise enforceable agreements set forth in this Agreement, and to avoid the actual or threatened misappropriation of the Information or goodwill, Employee agrees to the restrictive covenants set forth in this Agreement. Accordingly, Employee agrees that, during Employee's employment and for a period of one year following Employee's

separation from employment for any reason, Employee will not for any reason, accept employment or engage in any business activity (whether as a principal, partner, joint venturer, agent, employee, salesperson, consultant, independent contractor, director or officer) with a "Competitor" of the Company where such employment or activity would involve Employee:

(i)        providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products competitive with or similar to those services or products with which Employee had any involvement, and/or regarding which Employee had access to any Information, during Employee's employment with the Company (including any products or services being researched or developed by the Company during Employee's employment with the Company); or

(ii)       providing or performing services that are similar to any services that Employee provided to or performed for the Company during Employee's employment with the Company.

For purposes of this provision, a "Competitor" is any business or entity that, at any time during the one-year period following Employee's separation from employment, provides or seeks to provide, any products or services similar or related to any products sold or any services provided by the Company. "Competitor" includes, without limitation, any company or business that provides data colocation and related services to businesses or entities.

The restrictions set forth in this Section 5 will be limited to the geographic areas (i) where Employee performed services for the Company, (ii) where Employee solicited or served the Company's customers or clients, or (iii) otherwise impacted or influenced by Employee's provision of services to the Company. Notwithstanding the foregoing, Employee may invest in securities of any entity, solely for investment purposes and without participating in the business thereof, if (A) such securities are traded on any national securities exchange or the National Association of Securities Dealers Automatic Quotation System or equivalent non-U.S. securities exchange, (B) Employee is not a controlling person of, or a member of a group which controls, such entity and (C) Employee does not, directly or indirectly, own one percent (1%) or more of any class of securities of such entity.

6.        During Employee's employment and for a period of one year following Employee's separation from employment for any reason, Employee will not, directly or indirectly, through any person or entity, communicate with (i) any of the Company's customers known to Employee during Employee's employment with the Company and from which the Company generated revenue during the one-year period preceding Employee's separation from employment; (ii) any prospective customers known to Employee during the one-year period prior to Employee's separation from employment; or (iii) any of the Company's suppliers known to Employee during the one-year period prior to Employee's separation from employment, in each case, for the purpose or intention of (x) attempting to sell any products or services competitive with or similar to those products or services provided by the Company or (y) attempting to divert business of any such customer, prospective customer or supplier from the Company to a Competitor.

7.        In the event Employee is uncertain as to the application of this Agreement to any contemplated employment opportunity or business activity, Employee agrees to inquire in writing of the Company's Department of Human Resources, specifying the contemplated opportunity or activity. The Company will attempt to respond within ten (10) business days following receipt of said writing. In no event will the Company's failure to respond within ten business days constitute a waiver of any of the provisions of this Agreement.

8.        All ideas, inventions, discoveries, concepts, trademarks, or other developments or improvements, whether patentable or not, conceived by Employee, alone or with others, at any time during the term of Employee's employment, whether or not during working hours or on the Company's premises, which are within the scope of or related to the business operations of the Company ("New Developments"), shall be and remain the exclusive property of the Company. To the extent permitted by

law, all New Developments consisting of copyrightable subject matter shall be deemed "work made for hire" as defined in 17 U.S.C. § 101. To the extent that the foregoing does not apply, Employee hereby assigns to the Company, for no additional consideration, Employee's entire right, title and interest in and to all New Developments. Employee shall do all things reasonably necessary to ensure ownership of such New Developments by the Company, including the execution of documents assigning and transferring to the Company, all of Employee's rights, title, and interest in and to such New Developments, and the execution of all documents required to enable the Company to file and obtain patents, trademarks, and copyrights in the United States and foreign countries on any of such New Developments.

9.    Subject to Section 19 below, Employee will not disparage the Company in any way which could adversely affect the goodwill, reputation, and business relationships of the Company with the public generally, or with any of their customers, suppliers, or employees.

10.    During Employee's employment by the Company and for a period of one year following Employee's separation from employment for any reason, Employee will not, directly or indirectly, induce or seek to induce any other employee or consultant of the Company to terminate his/her employment or consulting relationship with the Company, nor will Employee, directly or indirectly, induce or seek to induce any other employee or consultant of the Company to accept employment with a Competitor, nor will Employee be involved in the hiring of any other employee or consultant of the Company on behalf of any person or entity other than the Company. Without limitation, Employee will not, directly or indirectly, induce or seek to induce any other current or former employee or consultant of the Company to violate any of his/her non-compete and/or non-solicitation and/or non-disclosure and/or non-disparagement agreement(s) with the Company.

11.    During Employee's employment by the Company and for a period of one year following Employee's separation from employment for any reason, Employee will, before accepting an offer of employment from any person or entity, provide such person or entity a copy of this Agreement. Employee authorizes the Company to provide a copy of this Agreement to any and all future employers of Employee.

12.    Employee represents that Employee is not bound by any agreement or other duty to a former employer or any other party that would prevent Employee from fully performing Employee's duties and responsibilities for the Company or complying with any obligations hereunder. Employee agrees that Employee will not use or disclose any confidential or proprietary information or trade secrets of any former employer or other person or entity in the course of Employee's employment with the Company, and Employee will not bring onto the premises of the Company any such information unless consented to in writing by such former employer, person or entity.

13.    Employee further agrees and consents that this Agreement and the rights, duties, and obligations contained in it may be and are fully transferable and/or assignable by the Company, and shall be binding upon and inure to the benefit of the Company's successors, transferees, or assigns.

14.    Employee further agrees that any breach or threatened breach of this Agreement would result in material damage and immediate and irreparable harm to the Company. Employee further agrees that any breach of the restrictive covenants contained herein would result in the inevitable disclosure of the Information. Employee therefore agrees that the Company, in addition to any other rights and remedies available to it, shall be entitled to injunctive and other equitable relief, without posting bond or other security, in the event of any such breach or threatened breach by Employee. Employee acknowledges that the prohibitions and obligations contained in this Agreement are reasonable and do not prevent Employee's ability to use Employee's general abilities and skills to obtain gainful employment. Therefore, Employee agrees that Employee will not sustain monetary damages in the event that Company obtains a temporary, preliminary or permanent injunction to enforce this Agreement.

15. If in any judicial proceeding or arbitration, a court or an arbitrator finds that any of the restrictive covenants in this Agreement exceed the time, geographic or scope limitations permitted by applicable law, Employee and the Company intend that such provision be reformed by such court or arbitrator to the maximum time, geographic or scope limitation, as the case may be, then permitted by such law. Furthermore, it is agreed that any period of restriction or covenant hereinabove stated shall not include any period of violation or period of time required for litigation or arbitration to enforce such restrictions or covenants.

16. Employee agrees that this Agreement shall be governed by the laws of the State of Texas, without giving effect to any conflict of law provisions. Employee further voluntarily consents and agrees that the state or federal courts with jurisdiction over Denton County, Texas: (i) must be utilized solely and exclusively to hear any action arising out of or relating to this Agreement; and (ii) are a proper venue for any such action and Employee consents to the exercise by such court of personal jurisdiction over Employee for any such action.

17. If any of the provisions in this Agreement conflict with similar provisions in any other document or agreement related to Employee's employment with Company, the provisions of this Agreement will apply; provided, however, if the restrictions set forth in the other document or agreement at issue are broader in scope than those in this Agreement and are enforceable under applicable law, those restrictions in the other document or agreement will apply. The provisions of this Agreement are severable. To the extent that any portion of this Agreement is deemed unenforceable, such portion may, without invalidating the remainder of the Agreement, be modified to the limited extent necessary to cure such unenforceability, such unenforceability shall not affect any other provisions in this Agreement, and this Agreement shall be construed as if such unenforceable provision had never been contained herein.

18. This Agreement does not obligate Company to employ Employee for any period of time and Employee's employment is "at will."

19. Notwithstanding any other provision of this Agreement, nothing contained in this Agreement limits Employee's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission (collectively, "Government Agencies"), or from providing truthful testimony in response to a lawfully issued subpoena or court order. Employee understands that this Agreement does not limit Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.

Accepted on March 09, 2017

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CYRUSONE LLC and , CYRUSONE, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:19-cv-00043-ALM |
| STUART LEVINSKY, | § § | |
| Defendant. | § | |

## ORDER EXTENDING TEMPORARY RESTRAINING ORDER

Before the Court is the parties' Agreed Motion to Extend Temporary Restraining Order with Request for Expedited Consideration (Dkt. #4).

After considering the Motion, the Court finds that, for good cause, the Motion should be, and hereby is, **GRANTED**. The bases for issuance of the temporary restraining order signed on January 14, 2019, as set out in that order are incorporated here by reference as if set out in full. It is therefore **ORDERED** that the Temporary Restraining Order issued on January 14, 2019, remains and will remain in effect through the date of this Court's ruling on Plaintiffs' Motion for Preliminary Injunction, or until further order of this Court.

It is further **ORDERED** that no additional bond or deposit in lieu thereof shall be required.

**SIGNED this 24th day of January, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

**ORDER EXTENDING TEMPORARY RESTRAINING ORDER – Page 1**

# EXHIBIT Q

Mark G. Tratos, Esq.
Nevada Bar No. 1086
tratosm@gtlaw.com
Lauri S. Thompson, Esq.
Nevada Bar No. 6846
thompsonl@gtlaw.com
Shauna L. Norton, Esq.
Nevada Bar No. 11320
nortons@gtlaw.com
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| SWITCH, LTD. a/k/a SWITCH COMMUNICATIONS GROUP, LLC, a Nevada limited liability company, | Case No.: 2:14-cv-01727-APG-NJK |
| Plaintiff, | **ORDER GRANTING STIPULATION FOR ENTRY OF PERMANENT INJUNCTION** |
| v. | |
| FIRESPOTTER LABS a/k/a SWITCH COMMUNICATIONS, INC., a Delaware corporation, | |
| Defendant. | |

This Court having reviewed and considered the Stipulation for Entry of Permanent Injunction submitted by Plaintiff Switch Ltd. aka Switch Communications Group, LLC, ("Plaintiff Switch") and Defendant Firespotter Labs aka Switch Communications, Inc. ("Firespotter") by and through their respective counsel of record, and for good cause appearing therefore:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      This Decree shall be the final judgment with prejudice of all claims each of the parties has raised against the other in this lawsuit, including all claims and counterclaims.

2.      Plaintiff Switch designs, constructs, and operates the world's most powerful telecommunications offerings, data centers, and service technology ecosystems.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

LV 420640111v1

3. Plaintiff Switch owns the mark SWITCH and multiple variants thereto, and has continuously been using the trademark SWITCH in connection with its data center, colocation, telecommunications, and cloud computing services in commerce since at least as early as November 30, 2003.

4. Plaintiff Switch owns multiple U.S. federal trademark registrations for its "SWITCH" marks, including but not limited to, SWITCH (U.S. Reg. No. 3,229,168), SWITCH T-SCIF (U.S. Reg. No. 3,547,908), SWITCH WDMD (U.S. Reg. No. 3,540,816), SWITCHNAP (U.S. Reg. No. 3,547,909), SWITCHNAP WORLD (U.S. Reg. No. 3,880,400), SWITCHFORCE (U.S. Reg. No. 3,942,121), SWITCH MICRO-MOD (U.S. Reg. No. 4,062,244), SWITCHSERVE (U.S. Reg. No. 4,058,546), SWITCHMOD (U.S. Reg. No. 3,984,525), SWITCH L.D.C. (U.S. Reg. No. 3,984,524), SWITCHCLOUD I.C.E. (U.S. Reg. No. 4,062,248), SWITCHSTACK (U.S. Reg. No. 4,107,725), SWITCH IC3 (U.S. Reg. No. 4,104,345), SWITCHCUBE (U.S. Reg. No. 4,335,332), SWITCHSCRIBE (U.S. Reg. No. 4,217,085), SWITCHGAUNTLET (U.S. Reg. No. 4,516,916) SWITCHGAUNTLET (U.S. Reg. No. 4,516,916) SWITCHWORKS (U.S. Reg. No. 3,942,079), SWITCHSAFE (U.S. Reg. No. 3,946,128), SWITCHMACROMOD (U.S. Reg. No. 3,984,966), SWITCH CLOUD AI (U.S. Reg. No. 4,050,103) SWITCHEDUP (U.S. Reg. No. 4,062,245), SWITCHCORE (U.S. Reg. No. 4,062,254), and SWITCHMICRO-MOD (U.S. Reg. No. 4,137,600)

(collectively hereinafter referred to as the "Switch Marks").

5. Based on Plaintiff Switch's federal registrations and extensive use, Plaintiff Switch owns the exclusive right to use the mark SWITCH and the Switch Marks in connection with telecommunications, data center, colocation, and cloud computing services.

6. The extensive advertising and promotion by Plaintiff Switch of the Switch Marks throughout the United States and around the world have resulted in the SWITCH name and mark being distinctive and famous for telecommunications services, data center, colocation, and cloud computing services.

7. On or about October 1, 2014, Firespotter, a technology start-up company located in San Francisco, California, began providing a cloud-based telephone system under the marks SWITCH and SWITCH.CO. In connection with its services, on or around July 27, 2014, Firespotter

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

1  acquired the Internet domain name <switch.co> and created the corresponding website.

2  THEREFORE, IT IS FURTHER ORDERED that Plaintiff Switch's request for Permanent

3  Injunction is GRANTED, subject to the transition period agreed upon by the parties.  Firespotter, its

4  respective officers, agents, servants, employees, affiliates, and/or all persons acting in concert or

5  participation with it, are permanently enjoined (1) from using Plaintiff Switch's SWITCH trademark,

6  the Switch Marks, or confusingly similar variations thereof, alone or in combination with any other

7  letters, words, letter strings, phrases or designs, in commerce or in connection with any business or

8  for any other purpose (including, but not limited to, on web sites and in domain names); and (2) from

9  registering, owning, leasing, selling or trafficking in any domain name containing Plaintiff Switch's

10  Switch Marks or confusingly similar variations thereof, alone or in combination with any other

11  letters, words, phrases or designs as the SWITCH mark is a famous mark.

12  The claims Firespotter has raised in this lawsuit are DENIED with prejudice.

13  IT IS SO ORDERED this 29th day of February, 2016.

14

15  _____

16  United States District Court Judge

17

18  Respectfully submitted by:

19  GREENBERG TRAURIG, LLP

20

21  /s/ Lauri S. Thompson
    Mark G. Tratos, Esq.

22  Lauri S. Thompson, Esq.
    Shauna L. Norton, Esq.

23  3773 Howard Hughes Pkwy.
    Suite 400 North

24  Las Vegas, NV 89169
    *Attorneys for Plaintiff*

25

26

27

28

LV 420640111v1